**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **)** | |
| | **)** | |
| **Plaintiff,** | **)** | |
| | **)** | **No. 18 CR 789** |
| **v.** | **)** | |
| | **)** | **Hon. Gary Feinerman** |
| **DENY MITROVICH,** | **)** | |
| | **)** | |
| **Defendants.** | **)** | |

## DEFENDANT'S OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT AND SENTENCING POSITION PAPER

Now comes the defendant, Deny Mitrovich, by and through his undersigned attorney, and respectfully requests that this Honorable Court, in light of *Gall v. United States*, 552 U.S. 38 (2007) and the factors set forth in 18 U.S.C. § 3553(a), sentence, sentence him to the most lenient sentence permissible under the law; one that is sufficient, but not greater than necessary, to comply with the purposes of sentencing. In support, the following is offered:

### INTRODUCTION

For eight (8) years, the gravity of the situation Deny Mitrovich has found himself in has been hanging over his head, day in and day out. The mistakes he made and the reprehensible crimes he committed during a four-month period have been with him and will follow him for the rest of his life, regardless of what sentence this Court ultimately imposes. Not only is he ashamed and embarrassed, but he is remorseful. If anything, this is an understatement. He apologizes to all of the victims, wholeheartedly.

Despite twenty (20) years of alcoholism, drug abuse, and untreated depression, Mr. Mitrovich has used this as an opportunity to better himself any way he can. He has remaining sober and productive, notwithstanding his terrifying and uncertain future. His conducted in this case ended in 2014. Eight years later, Mr. Mitrovich stands before this Court maybe not fully rehabilitated – it is a lifelong process – but as a man that has done everything that he can to better himself. As a man that poses no risk to the public and has much more to offer to the community, as evidence by the character letters submitted on his behalf.

Mr. Mitrovich knows that everything he has already lost and everything that he will lose following this sentence is no one's fault but his own. He wishes he could go back in time and under the trauma and damaged he has caused. But he knows he cannot. He can only move forward and make amends for his conduct the only way he knows how – by continuing to confront the roots of his conduct, committing to sobriety, and being the person those closest to him know him to be. Now, Mr. Mitrovich offers himself to the mercy of this Court, to consider not only those actions that brought him here, but to consider why he got to where he was and the progress he has made over the last eight (8) years. In doing so, he simply asks this Court to sentence him to a significantly below-guideline sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing.

I. **OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT ("PSR")**

Mr. Mitrovich does not qualify for the five-point enhancement pursuant to § 2G2.2(b)(3)(B) because he did not distribute in exchange for valuable consideration

as specifically contemplated by the guideline. The government's basis for this guideline, as contained in the plea agreement, is that Mr. Mitrovich updated child pornography to "The Love Zone" ("TLZ") website by contributing posts that included links to videos. *See, e.*g., Dkt. 130, pg. 3. In exchange for positing these links, Mr. Mitrovich would receive access to additional videos that he would otherwise not have access to. These facts are undisputed yet falls short of meeting the threshold for the five-point enhancement.

The 2016 amendments to §2G2.2(b)(3)(A-E) narrowed its scope, imposing more requirements that must be satisfied for the enhancement to apply. For the 5-point enhancement to apply under §2G2.2(b)(3)(B), "the government must show that the defendant: (1) agreed—explicitly or implicitly—to an exchange with another person under which (2) the defendant knowingly distributed child pornography to that other person (3) for the specific purpose of obtaining something of valuable consideration (4) from that same other person." *United States v. Oliver*, 191 F.3d 393, 403 (6th Cir. 2019).

For the distribution enhancement under §2G2.2(b)(3)(F) to apply, there must be more than merely posting a hyperlink to someone else's exploitive material. "'Distribution' in the guidelines is a term of art[.]" *United States v. Robinson*, 714 F.3d 466, 468 (7th Cir. 2013). "It is not enough, under the guidelines' definition, if the person has done no more than take a step that would make distribution easy at a later time." *United States v. Hyatt*, 28 F.4th 776, 784 (7th Cir. 2022). To be eligible for the enhancement, the defendant must distribute his own exploitive material. *See*

*Id.* at 783 ("Distribution is not present unless and until there is something related to a transfer of material *from the defendant to another person.*") (emphasis added). Indeed, it applies only to "a defendant who knowingly makes his child pornography available for others to access and download[.]" *United States v. Ryan*, 885 F.3d 449, 453 (7th Cir. 2018) (quotations omitted).

The Seventh Circuit has made it clear that, while broad, the distribution enhancement does not apply with "strict liability." *Robinson*, 714 F.3d at 468. In this manner, when the defendant does not knowingly make his own exploitive material accessible to others then the enhancement does not apply. For example, there was no distribution when the defendant merely uploaded his own material into his own personal cloud-storage device. *Hyatt*, 28 F.4th at 782-86. Even if uploading the images constituted transportation of child pornography, there was no evidence that there was any "transfer from [the defendant] to some other person[.]" *Id.* at 785; *see also Robinson*, 714 F.3d at 468 (stating, while explaining how the distributor enhancement applies that in peer-to-peer networks cases, that one may be an unknowingly distributor "if other persons do in fact *access his files of child pornography*[.]") (emphasis added); *see also United States v. Durham*, 618 F.3d 921, 930-32 (8th Cir. 2010) (stating that merely using a "file-sharing program" does not establish the distribution enhancement alone even if the defendant's personal files were accessible). Similarly, in *United States v. Merrill*, there was no distribution when the defendant emailed illicit material from his phone to his computer because he "did not take any actions to make *his stash* of child pornography available to

4

others[.]" 578 F. Supp. 2d 1144, 1152 (N.D. Iowa 2008). "Mere movement or copying of the pictures from one medium to another" did "not trigger the enhancement[.]" *Id.*

Further, the hyperlink itself is not child pornography which is the only thing that Mr. Mitrovich shared. *See United States v. Navrestad*, 66 M.J. 262, 266 (C.A.A.F. 2008) (sending a hyperlink to a public website containing images of child pornography was legally insufficient to constitute distribution under the Child Pornography Prevention Act); *see also Ryan*, 885 F.3d at 453 (applying the same distribution standard for both the substantive distribution offense under 18 U.S.C. § 2252 and the §2G2.2 enhancements). Thus, not only did Mr. Mitrovich not distribute any illicit material in his possession, but he did also not distribute illicit material at all.

The probation office's recommendation mistakenly contemplates that Mr. Mitrovich distributed all the images and videos that were found on his computer and hard drives. This is misguided and not supported by the evidence nor is it government's position that Mr. Mitrovich did this. The only "distribution" was the posting of links to video that did not belong Mr. Mitrovich and were not in his possession.

Even if Mr. Mitrovich's posting of a link to TLZ constitutes distribution – it does not – "[t]he distribution must be part of that explicit or implicit agreement, *i.e.*, the defendant understands or believes—even if incorrectly—that this distribution is in pursuance of his obligation under the agreement." *Id.* The defendant's acts of distributing "must be for the 'specific purpose' of receiving the valuable consideration." *Id.* Lastly, the defendant's "distribution must be to the 'other person'

with whom the defendant has 'agreed to an exchange.'" *Id*. at 403-04. In other words, "if the defendant's distribution is to a party other than the party from whom he expects to receive 'valuable consideration,' the distribution is not part of an agreement 'to exchange' as articulated by the enhancement." *Id*. at 402.

Under the more stringent standard, the enhancement is inapplicable if the defendant shared child pornography material in peer-to-peer networks or illicit online communities with the mere expectation that it would give him "preferential access to more child pornography." *United States v. Halverson*, 897 F.3d 645, 649 (5th Cir. 2018). In *Halverson*, the defendant shared his exploitive material on a peer-to-peer network knowing sharing more material would give him access to more child pornography and "preferential access to his requested downloads" from other members. *Id*. But this general expectation was no longer enough to meet the stricter requirements of §2G2.2(b)(3)(B). *Id*. 651-52. While there was evidence that he agreed to exchange child pornography for the purpose of obtaining consideration, there was no evidence that he distributed the material "to receive something of valuable consideration from that person with whom he traded." *Id*. (internal quotation omitted).

For this same reason, §2G2.2(b)(3)(B) did not apply to a defendant that shared child pornography with an undercover cop with "the desire to meet" the undercover agent's daughter to engage in sexual intercourse. *Oliver*, 919 F.3d at 395-96. The actual distribution must be made "under" the "agreement to exchange with another person." *Id*. at 405. While the defendant hoped to gain access to the agent's underage

daughter by sharing the material, the defendant's "unilateral purpose or belief cannot, by itself, control." *Id*. Thus, there was not enough evidence that the distribution was made under an agreement and the enhancement did not apply. *Id*.; *see also United States v. Mayokok*, 854 F.3d 987, 989-991 (8th Cir. 2017) (vacating §2G2.2(b)(3)(B) enhancement because uploading illicit images to a file-sharing website and attaching them to emails does not establish that the material was exchanged to receive a thing of value).

This case is inapposite from *Halverson*. While the posting of links to videos gave Mr. Mitrovich access to additional content, there was no evidence that he received something of value from the people that clicked the link. The consideration was from the website, not from the people clicking the link.

## II. SENTENCING CONSIDERATIONS PURSUANT TO 18 U.S.C. § 3553(A) SUPPORTING A NON-CUSTODIAL SENTENCE

This Court maintains unfettered discretion to fashion a sentence that punishes the offender, as opposed to the crime itself. *Pepper v. United States*, 131 S.Ct. 1229, 1240 (2011); *United States v. Ramirez-Mendoza*, 683 F.3d 771, 777 (7th Cir. 2012). After first calculating the applicable sentencing range, district courts are then tasked with imposing a sentence that is reasonable under 18 U.S.C. § 3553(a). However, because sentencing guideline ranges are not to be presumed reasonable, this Court must consider whether they actually conform to the circumstances of the case. *Nelson v. United States*, 555 U.S. 350 (2009) (*per curiam*); *United States v. Dean*, 414 F.3d 725, 730-31 (7th Cir. 2005). So long as the selected sentence is "rooted in § 3553(a), sufficiently individualized to the circumstances of [the] case, and generally associated

with sentencing leniency[,]" a below-guidelines sentence is appropriate. *United States v. Wachowiak*, 496 F.3d 744, 745 (7th Cir. 2007).

In fashioning his sentence, one that is sufficient but not greater than necessary, Mr. Mitrovich respectfully asks this Court to consider the nature and circumstances of the offense, his personal history and characteristics, the collateral consequences he faces as a result of his terrible judgment that led to his criminal conduct, and the flaws of Section 2G2.2 sentencing enhancements, among many other factors.

### a. ADVISORY GUIDELINE RANGE

A sentencing court's inquiry begins by calculating the defendant's advisory Guideline range. *United States v. Schroeder*, 536 F.3d 746, 755 (7th Cir. 2008). With the above-described positions in mind, Mr. Mitrovic's adjusted offense level is 28. Coupling the resulting anticipated offense level of 28 with a criminal history category of I, Mr. Mitrovich advisory sentencing range is 78 to 97 months' imprisonment.

However, not all sentences within the guideline range are reasonable. *See United States v. Cunningham*, 429 F.3d 673, 676 (7th Cir. 2005) ("[T]he sentencing judge may not rest on the guidelines alone, but must, if asked by either party, consider whether the guidelines sentence actually conforms, in the circumstances, to the statutory factors . . . He cannot treat all sentences that would fall within the guidelines sentencing range as reasonable per se."). To that end, the defendant is free to recommend any sentence deemed fair and appropriate. *Id*. As one district court judge has put it, the Guidelines' "most fundamental flaw is the notion that the

complexity of human character and conduct can be rationally reduced to some arithmetic formula."[1]

In light of the following considerations, Mr. Mitrovich respectfully requests this Honorable Court to exercise its discretion, in accordance with the § 3553(a) factors and *Gall*, and sentence him as leniently as is permissible under the law.

### b. Nature and Circumstances of the Offense

There is no question that Mr. Mitrovich knows what he did was wrong. He knows his conduct was horrible and there is absolutely no excuse for what he did. But in determining punishment, "a sentencing judge must consider not only the seriousness but also the nature and circumstances of the offense." *Warner*, 792 F.3d at 859. Here, it is notable the unique factors that differential Mr. Mitrovich from the typical sex offender that continues to pose a threat to the public.

Mr. Mitrovich's conduct began and ended with the "cyberguy" profile on TLZ. The profile was created in early August 2014 and was lasted until December 2014. While admittedly not a "lapse in judgment", this case was limited to a four-and-a-half-month span during which Mr. Mitrovich was in one of the darkest points of his life. *Cf. United States v. Devries*, No. 17 CR 31 (for nearly ten years defendant collected, shared, and gratified himself with depictions of infants, toddlers, and prepubescent children being raped and sexually abused); *United States v. Willis*, 16 CR 542 (for seven years defendant, an attorney, recruited, drugged, and sexually molested minors to manufacture child pornography).

---

[1] Terry Carter, *Rakoff's stance on the SEC draws fire, praise – and change: The Judge Who Said No*, ABA Journal, Oct. 2013, at 53.

At the time Mr. Mitrovich engaged in this reprehensible conduct, he was in the midst of a debilitating drug addiction. He was drinking (PSR ¶ 50, 60), smoking cannabis every day (PSR ¶61), using cocaine weekly (PSR ¶62), and using methamphetamines every day (PSR ¶63). This was happening against the backdrop of a failing marriage and a childhood plagued with abuse (PSR ¶56). This has led to a diagnosis of Sever Episode of Major Depressive Episode (PSR ¶56), wherein Mr. Mitrovich was left feeling hopeless, helpless, worthless, decreased interest in activities, and symptoms of anxiety. *Id.*

In sentencing Mr. Mitrovich this Court may consider his mental conditions and need for certain medical care when determining the sentence, it believes to be appropriate. 18 U.S.C. § 3553(a)(2)(D) (mandating consideration of "the need for the sentence imposed. . . to provide the defendant with . . .medical care, or other correctional treatment in the most effective manner"); *see United States v. Powell*, 576 F.3d 482, 499 (7th Cir. 2009) (instructing sentencing court to consider defendant's arguments about his physical infirmities and advanced age). The guidelines provide a policy statement, § 5H1.3, that provides that "[m]ental and emotional conditions may be relevant in determining whether a departure is warranted, if the condition or appearance, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines." In certain cases, "a downward departure may be appropriate to accommodate a specific treatment purpose." *Id.*

While whatever diminished capacity or depression Mr. Mitrovich exhibits, it is neither a defense to the alleged crime or an excuse for commit it. Instead, without giving rise to a legal defense or a formal departure, it does focus the lens through with this Court should assess certain factors in § 3553(a). Aside from Mr. Mitrovich's "personal history and characteristics", it should also be view within the framework of "just punishment for the offense" under § 3553(a)(2)(A) requires considering Mr., Dotson's mental state as a mitigation factor. *See, e.g. United States v. Roach*, 00 CR 411 (Memorandum Opinion and Order, August 22, 2005). As the Seventh Circuit suggested in *United States v. Dean*, 414 F.3d 725, 729 (7th Cir. 2005), "'just punishment' also includes the concept of retribution – which, considered fairly, requires an assessment of the relative culpability of the offender – and may also include the concept of deterrence and rehabilitation, both of which may depend in part on the offender's personal characteristics." *Id*., pg. 6.

Surely, Mr. Mitrovich should be viewed differently, in justice and fairness, then an individual who committed an equally serious offense without the underlying mental health issues. It would certainly benefit Mr. Mitrovich for this Court to see to it, there be a mental treatment mandated as part of a term of supervised release, with any necessary treatment. He has already been in therapy and the results are unmistaken. And this should continue to be done. The record in this case gives rise to compelling inferences that if Mr. Mitrovich does not have appropriate and continuing therapy, his mental state may continue preventing him was critically

analyzing life's various obstacles and has contributed to recurrence in his previously worsening of behavior.

Additionally, Mr. Mitrovich has no prior history of criminal conduct with minors. Shortly after the government executed a search warrant on Mr. Mitrovich's residence, not only did he readily admit his conduct and attempt to cooperate with the government, but he also voluntarily participated in a polygraph examination conducted by the FBI regarding, among other things, any inappropriate relationship he may have had with an underage child. In addition to that, the government interview several family members and their children about Mr. Mitrovich. They all said the same thing, that there was never any inappropriate touching or comments.

Mr. Mitrovich's post-offense conduct has also proven that he is among the types of offenders who can be rehabilitated and not pose any sort of potential danger to victims of child pornography. For the last four years, he has been participating in mental health treatment services, taking the prescribed medication, becoming sober completely cold turkey, and has kept steady employment, even during the unprecedented pandemic. He truthfully proffered with the government, admitted his actions on the day of the search warrant, turned over all of his passwords, and attempted to cooperate with the government. Whether taken into consideration separately or together, all of the above mitigation supports a sentence significantly below the guidelines, with any length of supervised release this Court deems appropriate.

### c. MITROVICH'S PERSONAL HISTORY AND CHARACTERISTICS

The roots of the psychological issues that plagued Mr. Mitrovich's judgment when he engaged in the reprehensible conduct that landed him before this Court can be directly traced back to his childhood and adolescence. Although he grew up in a seemingly loving and tight-knit family, there were certain aspects of his life that led to a life afflicted by alcohol and drug addiction, and mental health concerns that were not addressed until it was, unfortunately, too late.

Mr. Mitrovich was born in 1978 as one of three children to Denny and Svetlana. He grew up on the Northwest side of Chicago, living above his family's bar. His mother ran the bar while his father worked as a factory worker and a short-order cook. Financially, Mr. Mitrovich's family was able to make ends meet. But his life at home was anything but easy.

Throughout his entire childhood, Mr. Mitrovich was both emotionally and physically abused by his father. His father was short-tempered and his punishment's were excessive. Many times, Mr. Mitrovich and his brothers had to step in, when his father was hitting his mother. *See Santosky v. Kramer*, 455 U.S. 745, 789 (1982) (Rehnquist, J., joined by Burger, C.J., White, and O'Connor, J., dissenting) ("It requires no citation of authority to assert that children who are abused in their youth generally face extraordinary problems developing into responsible, productive citizens.").

The abuse was mentally damaging because of his father's gaslighting. As Mr. Mitrovich described him, he was like "Dr. Jekyl and Mr. Hyde". This caused Mr.

Mitrovich's lifelong battle with depression to manifest itself. During one intense depressive episode during his youth, Mr. Mitrovich thought out a plan to commit suicide by jumping in front of a moving train. PSR, ¶ 56.

Mr. Mitrovich's life took a turn for the worse when he was in high school. Particularly when he was sixteen (16) years old: he was expelled from high school for fighting, he began a relationship with a thirty-two (32) year old woman, began using cannabis on a daily basis, began using cocaine, and began using methamphetamines. Coupling with his alcohol abuse, the resulting drug dependency and confusion about relationship stemming from his inappropriate relationship with an older woman followed him for the next twenty (20) years – until the day of the search warrant.

Despite these debilitating setbacks, Mr. Mitrovich was ultimately able to graduate from high school. Following high school, Mr. Mitrovich took college classes, completed HVAC classes, and earned several certificates including field engineering, concrete levels I through III, asphalt levels I through III, and steel inspection. He has been able to maintain steady employment throughout his adult life, including after the search warrant was executed, after his indictment, and during the unprecedented COVID-19 pandemic.

When Mr. Mitrovich was twenty-two (22) years old, he married Reyna. Their relationship, however, was doomed from the beginning. In addition to Mr. Mitrovich's depression and drug dependance, his wife was diagnosed with bipolar disorder. This led to constant disagreements and a toxic relationship that often led to Mr. Mitrovich and his wife living separate lives under one roof. Their marriage produced no

children and they have since separated. While their relationship was never strong, the instant offense created an irreparable wedge between them. Although Mr. Mitrovich attempted for years to salvage the relationship, his wife has since left him, started a new relationship, and has filed for divorce.

Mr. Mitrovich's wife was not the only person he lost since the beginning of this case. Approximately one year ago, Mr. Mitrovich's father passed away. Over the years their relationship had strengthened and his father became a pillar of support in his life. With his death, Mr. Mitrovich "lost his best friend and father."[2] Now, Mr. Mitrovich is on the verge of losing his mother. She recently suffered a debilitating stroke. He is worried that should he be incarcerated for any significant period of time, he will never have the chance to see his mother again. She is too sick to visit him in prison.

One of the most heartbreaking aspects of Mr. Mitrovich's life is his decision to not see or forge a relationship with his son. His son, Isaiah, was born in 2020. Mr. Mitrovich made the decision to not be a part of his son's life because of the uncertainty of his future. Not only did he not want his son to lose a father, he did not want his son to be embarrassed about what his father did and what he will be branded as for the rest of his life. Nonetheless, Mr. Mitrovich provides monthly financial support (without a court order) to make sure he has some sort of positive impact on his life.

Despite the "ups and downs" Mr. Mitrovich has had throughout his life, "he is a kind and cares for everyone."[3] The people closest to him see him as "an amazing

---

[2] Walid Ibraheem letter.
[3] Bayasgalan Baatarjav letter.

and helpful friend. . .and all around good person."[4] And there is no one who appreciates the severity and gravity of this more than Mr. Mitrovich. "He has seen first-hand the cost of [his] mistakes and . . .has learned his lesson and the hardships it has created based on those actions."[5] No one knows better than his that his "life has been ruined[.]"[6] Not only that, but he has seen the effects of his actions on those closest to him. His remorse is genuine and cannot be overstated.

### d. UNIVERSAL APPLICATIONS OF SECTION 2G2.2 SENTENCING ENHANCEMENTS SUPPORTS BELOW-GUIDELINE SENTENCE

Both Courts and the Sentencing Commission have expressed concern over treating as aggravating factors those that appear in every case and rachet up the guidelines without consideration of individual dangerousness. These aggravating factors are contained within Section 2G2.2 of the guidelines and have been routinely applied in this case. To that end, it is well-settled that a district court's sentencing discretion allows rejection or disagreement with the child pornography guidelines on poly ground under Section 3553(a) if the sentence is reasonable. *United States v. Pape*, 601 F.3d 743, 745 (7th Cir. 2010). This is appropriate in this case.

This is particularly important in non-production child pornography cases such as the instant matter where the excruciatingly high offense level is being driven by the highly criticized Section 2G2.2. This child pornography guideline "has come under significant judicial criticism for being based on politics rather than data, and Circuit courts routinely find that 2G2.2 is unworthy of serious deference." *United*

---

[4] Leisha Torres letter.
[5] Mona Ibraheem letter.
[6] David Mitrovich letter.

*States v. Kelly*, 868 F. Supp. 2d 1202, 1201 (D.N.M. 2012). "This is largely due to serious flaws in [Section] 2G2.2, which was not drafted pursuant to the Sentencing Commission's usual expertise, and all too frequently generates unjustly excessive terms of incarceration." *Id*. At 1211.

Section 2G2.2 fails to adequately delineate culpability, warring a downward variance from the guidelines. "These sentencing enhancements are almost always applicable because the Internet is now the primary vehicle for delivering or consuming pornography (legal and illegal) and the number and type of images received is frequently accidental; it is thus a poor indicator of culpability." *United States v. Burns*, No. 07 CR 556, 2009 WL 3617448, at *7 (N.D. Ill. Oct. 27, 2009). Thus, the number of images and videos found on Mr. Mitrovich's hard drives, although high, are not good indicators of his culpability.

*Burns* clarified:

> [m]ost obviously, this means of distribution facilitates the easy collection of a large number of images (triggering the enhancement for quantity). Moreover, because digital collections are generally built through trading images in Internet chat rooms, a defendant generally has very little control over the quantity of images he receives or the content of those images (triggering enhancements for depictions of sadistic sex acts and pictures of children under the age of twelve). The predominance of this illicit bartering also means that most defendants receive another enhancement for distributing images of child pornography. *See* § 2G2.2(b)(3) (F). Given their broad applicability, then, most of the enhancements provided for in § 2G2.2 are of little use in distinguishing between offenders and place most first offenders in the mine run case at or above the statutory maximum sentence.

2009 WL 3617448, at *7.

The same is true of the use of a computer enhancement (§ 2G2.2(b)(b)). The "enhancement for use of a computer does not make much sense because online pornography comes from the same pool of images found in specialty magazines or adult bookstores." *United States v. Hanson*, 561 F. Supp. 2d 1004 ( E.D. Wis., June 20, 2008) (rejecting application of nearly every enhancement under § 2G2.2 because the enhancements are applied to nearly every offender and therefore fail to distinguish between more and less culpable conduct). The *Hanson* court also recognized the ease of obtaining over 600 imagines with minimal effort, as a result of internet swapping, leading got five-level increases pursuant to § 2G2.2(b)(7)(D). Id. And further recognizing that "some of these images will contain materials involving a prepubescent minor." *Id*.

The nature of websites such as the one used by Mr. Mitrovich, people are likely to receive any number of images without seeking out a particular type of content. This is exactly what happened here. *See supra*. And the use of a computer to facilitate the charged conduct is inevitable under the current usage patterns and that creates a high number of images without showing that a defendant is actually seeking out more culpable content. As the *Hanson* court pointed out, "[t]o the extent that harsh punishment is necessary in these types of cases to reduce the demand for material that results in harm to children, a defendant who does not seek out the worst of that material should not receive the same sentence as someone who does." *Hanson*, 561 F. Supp. 2d 1004.

In 2021, the United States Sentencing Commission issued an expanding report on child pornography offenses that do not involve production. *See*, https://www.ussc.gove/research/research-reports/federal-sentencing-child-pornography-non-production-offenses (last accessed October 2, 2021). Among the findings was the Section 2G2.2 "contains a serious of enhancements that have not kept pace with technological advancements". *Id*. Four of the six enhancements – accounting for a combined 13 offense levels – cover conduct that has become so ubiquitous that they now apply in the vast majority of cases sentenced under Section 2G2.2. And because of the advancements in digital and mobile technology, non-production child pornography offenses increasingly involve voluminous quantities of videos and images that are graphic in nature, often involving the youngest victims.

Mr. Mitrovich does not intend to downplay the seriousness of his conduct. Instead, the routine guideline enhancements in this case give reason for this Court to significantly vary downward from the guidelines, as they are not a true measure of culpability – particularly within the framework of Section 3553(a). While Mr. Mitrovich will be punished, the guideline range, whichever this Court will end up at, is not a perfect tool to determine culpability and the ultimate sentence.

### e. DETERRENCE AND RECIDIVISM

The goal of sentencing is to impose a sentence that is sufficient, but not greater than necessary to comply with the purposes set forth in § 3553(a)(2). Through this "parsimony provision," the Court is to impose a sentence that is the *minimum* necessary to accomplish those goals set forth in paragraph (2). As a first-time felony

offender whose crime, although serious, was non-violent in nature, a sentence at the low-end of the advisory guidelines would, without a doubt, meet the goals of sentencing. *See* 28 U.S.C. § 994(j), *amended (this section unaffected)* by PL 11-273, Oct. 12, 2010, 124 Stat 2858.

As someone who has never been subjected to a term of imprisonment, prior to his bond revocation (nor charged with a serious crime), the time already spend incarcerated has had a chilling impact on Mr. Mitrovich, certainly more so than someone previously subjected to imprisonment. *See United States v. Baker*, 445 F.3d 987, 990-92 (7th Cir. 2006) (upholding downward variance based on the fact that "a prison term would mean more to [a defendant who has never been incarcerated before] than to a defendant who previously has been imprisoned").

No matter the sentence, there has already been a permanent and profoundly hard impact on Mr. Mitrovich's life. Having been compounded with the already ever-present anxiety and depression, his mental state has now continued to worsen. The emotional toll of being under government scrutiny for eight (8) years cannot be overstated. From 2014 until 2018, Mr. Mitrovich proffered with the government, took lie detector tests, have members of his family questions about possible sexual advances towards minor family members, attempting to cooperation, and waiting for an inevitable indictment to be filed. From 2018 through the present, Mr. Mitrovich has been on pretrial supervision with electronic monitory, during which he was been allowed movement to work and to attend therapy and other activities bringing him

in contact with the public.  He has fully complied with all of the conditions of supervised release.

Furthermore, according to § 3553(a)(2), an appropriate sentence should "afford adequate deterrence to criminal conduct" and "protect the public from further crimes of the defendant."  Granted a sentence must reflect the seriousness of the offense and provide for adequate deterrence.  There is no evidence in this case that Mr. Mitrovich poses any sort of danger to society or danger or reoffending.  The public does not need protection from him.  He has been committed to his rehabilitation and sobriety.

Mr. Mitrovich is also mindful that this Court must consider general deterrence. However, this is not a factor that the Court must consider mechanically.  *United States v. Molton*, 743 F.3d 479, 486 (7th Cir. 2014) (recognizing that sentencing judges "should consider general deterrence but must also hand down an 'individualized sentence'")(*quoting Gall*, 522 U.S. at 50); *see also United States v. Brubaker*, 663 F.2d 764, 769 (7th Cir. 1981)("Consideration of general deterrence is proper provided it does not result in a mechanistic imposition of a sentence").  And while the effective deterrence of other crimes may generally require "a credible threat of imprisonment," that objective "does not necessitate imprisonment in every case."  *United States v. Warner*, 792 F.3d 847, 861 (7th Cir. 2015); *see also United States v. Hill*, No. 15-3090 (7th Cir. April 7, 2016) ("There is potentially substitutability between prison and the conditions [of supervised release]. Both types of punishment restrict the defendant's freedom").  To that end, general deterrence in the instant matter would be satisfied by a sentence of probation.  *United Stats v. Kappes*, 782 F.3d 828, 836 (7th Cir. 2015)

(well-tailored supervise release condition "serve the purposes of deterrence, rehabilitation and protection of the public").

Even though it was by his own doing, Mr. Mitrovich's life will never the be the same. He All the already difficult collateral consequences suffered by inmates – loss of employment, financial stress, shame - are amplified when the inmate is a sex offender. These consequences, in addition to the requested ten years in jail, will no doubt serve as a cautionary tale to others similarly situated to Mr. Mitrovich – a non-violent offender whose drug addiction and psychological issues were at the root of his conduct. Similarly, these severe consequences can be separately considered under 18 U.S.C. §3553 in support of a sentence below the guidelines. *Wachowiak*, 496 F.3d at 747 (substantial deviation from guidelines appropriate in child pornography case given the collateral consequences suffered by the defendant as a result of the conviction including the loss of his career as a music teacher and his forced resignation from numerous other jobs). See also, *United States v. Nesbeth*, No. 15-CR18 (E.D.N.Y. May 25, 2016) (drug defendant sentenced to probation despite guideline range of 33-41 months' incarceration based in part on the collateral consequences defendant faced as a convicted felon). [7]

First, while Mr. Mitrovich is extremely grateful to be on bond pending his sentencing, these last four (4) years have not been easy. With this case, Mr. Mitrovich

---

[7] Collateral consequences include restrictions on employment, travel, housing, banking, voting, employment and benefits. *See Nesbeth*, 15-CR-18 ("Remarkably, there are nationwide nearly 50,000 federal and state statutes regulations that impose penalties, disabilities, or disadvantages on convicted felons").

lost his family, his friends, his condominium (after sentencing), and his freedom. Even before pleading guilty, Mr. Mitrovich was subject to mandatory conditions such as electronic monitoring, home confinement, no access to a smart-phone or any internet-connected devices, and no computer. His every movement is monitored.

Second, like his time on pre-sentence release, Mr. Mitrovich will be subjected to several restrictions while in BOP custody that will make his prison time considerably more difficult than a white-collar offender. Mr. Mitrovich will be disqualified from minimum security (camp) placement and will be housed at least at a low-security institution. Mr. Mitrovich will not be eligible for reductions in his sentence after successful completion of the RDAP (alcohol and drug treatment) program. Similarly, he will be disqualified from participating in programs and receiving incentives, including use of the BOP inmate electronic mail systems, participation in First Step Act programs, and receipt of reductions in time. Despite no indication that sex offender specific treatment is clinically necessary, Mr. Mitrovich will likely be required to participate in some sex offender management program during custody. While sex offenders are eligible for pre-release placement (halfway house/home confinement), many Residential Reentry Centers (RRCs) refuse to take sex offenders and sex offender registration requirements also may interfere with a sex offender's ability to transition after release. Finally, just like in the public sphere, Mr. Mitrovich's status as a sex offender will subject him to risks not faced by other inmates, including assaults and other reprisals. *United States v. Kelly*, 868 F. Supp 2d 1202, 1204 (D.N.M. 2012) (in sentencing pornography defendant to

mandatory minimum, Judge noted that defendant would "be subject to serious danger in prison.").

Third, when Mr. Mitrovich leaves prison he will be given a period of supervised release with sex offender conditions in addition to the mandatory and standard conditions of probation. It is well established in this Circuit that a period of supervised release following a custodial sentence is not just an "add on" but that it also serves the objectives of general deterrence and rehabilitation. *United States v. Kappes*, 782 F.3d 828, 836 (7th Cir. 2015) (well-tailored supervised release conditions "serve the purposes of deterrence, rehabilitation and protection of the public."). Particularly here, when the conditions will be even more restrictive and severe, including the monitoring of his computer and phone use, random and warrantless searches of his home, car, office, and personal property, unannounced visits at work, and participation in a mental health or sex offender treatment program. U.S.S.G. §5B1.3(7).

Fourth, even when Mr. Mitrovich is out of BOP custody and done with supervised release, he will never truly be free of the shackles that bind sex offenders. Although Mr. Mitrovich is not a pedophile or a dangerous person, he will be branded a sex offender for the rest of his life, subjecting him to sex offender registration, residence, employment, and travel restrictions, and the loss of important civil rights. Because his information will always be easily accessible to the public, Mr. Mitrovich could also be the victim of public hysteria, including physical and emotional abuse.

These limitations put forth by significantly below-guideline term of incarceration and a term of supervised release, in conjunction with the significant collateral consequences of a federal sex offense conviction will suffice to not only deter Mr. Mitrovich from future crimes but will serve as a deterrent to all potential offenders in similar situations. *See United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006), *aff'd mem.*, 301 Fed. Appx. 93 (2d Cir. 2008) ("But as to [general deterrence], there is considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white-collar' offenders") (citations omitted); *see also* U.S.S.C., *Fifteen Years of Guidelines Sentencing* 56 (2004) (Sentencing Guidelines were written, in part, to "ensure a short but definite period of confinement for a larger proportion of these 'white-collar' cases, both to ensure proportionate punishment and to achieve deterrence").

### f. UNWARRANTED SENTENCING DISPARITIES WITH SIMILARLY SITUATED DEFENDANT SENTENCED BY THIS COURT

Although Mr. Mitrovich understands that every case and different and unique, this Court has shown a willingness to depart downwards in equally, if not more, serious cases involving the similar cases. For example, in *United States v. Schumacher*, Case No. 18 CR 377, this Court sentenced the defendant to 18 months' incarceration despite an advisory guideline range of 97 to 121 months' imprisonment based, in part, on the defendant possessing 10,906 child pornography images and videos, some of which were of minors under 12 years old and engaged in chats soliciting such materials.

25

Mr. Mitrovich understands that that although superficially the conduct with Schumacher is similar (even though Mr. Mitrovich possessed significantly less materials), his ultimate sentence will be based on his own conduct and not that of someone else, at a different time, with different 3553(a) factors. Still, he asks this Court to show both the leniency and compassion it exhibited in *Shumacher* but varying significantly below his advisory guideline range and ensuring his sentence does not create an unwarranted disparity with other, similarly situated defendants sentenced by this Court.

## CONCLUSION

This Court holds significant discretion to not only craft a reasonable, appropriate sentencing pursuant to the guidelines, but to consider the totality of circumstances surrounding the individual involved. Mr. Mitrovich asks this Court to balance the need for retribution with the unique nature and circumstances of this case, his acceptance of responsibility, his conduct over the last eight years, and the collateral consequences he has and will continue to suffer for the foreseeable future. A significantly below-guideline sentence, plus a lengthy period of sex offender supervised release, and a lifetime of collateral consequences as a sex offender, is a significant sentence under any circumstances. This significance is further underscored by Mr. Mitrovich's rehabilitation and that he poses no future threat to society. In sentencing Mr. Mitrovich to the most lenient, below-guideline term of imprisonment available under the law, this Court would accomplish the goals of

sentencing by punishing the individual, not the crime, to a sentence that is sufficient, but not greater than necessary. *See Pepper*, 131 S.Ct. at 1240.

Respectfully submitted,

*/s Vadim A.Glozman*
*Attorney For Deny Mitrovich*

Vadim A. Glozman
LAW OFFICES OF VADIM A. GLOZMAN
53 W. Jackson Blvd., Suite 1128
Chicago, IL 60604
(312) 726-9015
vg@glozmanlaw.com

## **CERTIFICATE OF SERVICE**

I, Vadim A. Glozman, an attorney for Defendant Deny Mitrovich, hereby certify that on this, the 4th day of October, 2022, I filed the above-described document on the CM-ECF system of the United States District Court for the Northern District of Illinois, which constitutes service of the same.

Respectfully submitted,

*/s/ Vadim A. Glozman*

LAW OFFICES OF VADIM A. GLOZMAN
53 W. Jackson Blvd., Suite 1128
Chicago, Illinois 60604
(312) 726-9015