<pre>
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3
     UNITED STATES OF AMERICA,        )
 4                                    )
                     Plaintiff,       )
 5                                    )
     -vs-                             )  Case No. 18 CR 789
 6                                    )
     DENY MITROVICH,                  )  Chicago, Illinois
 7                                    )  December 19, 2022
                     Defendant.       )  10:15 a.m.
 8
                    TRANSCRIPT OF PROCEEDINGS
 9          BEFORE THE HONORABLE GARY FEINERMAN

10   APPEARANCES:

11   For the Government:      HON. JOHN R. LAUSCH, JR.
                              UNITED STATES ATTORNEY
12                            BY:  MR. ANDREW C. ERSKINE
                              219 South Dearborn Street, Suite 500,
13                            Chicago, Illinois  60604
                              (312)353-5300
14

15   For the Defendant:      LAW OFFICES OF VADIM A. GLOZMAN
                              BY:  MR. VADIM A. GLOZMAN
16                            53 West Jackson Boulevard
                              Suite 1128
17                            Chicago, Illinois  60604
                              (312) 726-9015
18

19   Also Present:           MR. MICHAEL ALPER, U.S. Probation.

20                           MR. JUSTIN WIERSEMA, Pretrial Services.

21
     Court Reporter:
22
                    CHARLES R. ZANDI, CSR, RPR, FCRR
23                      Official Court Reporter
                    United States District Court
24          219 South Dearborn Street, Room 2144-G
                    Chicago, Illinois  60604
25              Telephone:  (312) 435-5387
            email:  Charles_zandi@ilnd.uscourts.gov
</pre>

1       (Proceedings heard in open court:)

2               THE CLERK:  18 CR 789, USA versus Mitrovich.

3               THE COURT:  For the government?

4               MR. ERSKINE:  Good morning, your Honor.  Andrew

5       Erskine on behalf of the United States.  And would you like us

6       at the tables or the lecterns?

7               THE COURT:  Completely up to you, whatever you're

8       more comfortable with doing.

9               MR. GLOZMAN:  Maybe we can sit.  Mr. Mitrovich has an

10      injury, if that's okay.

11              THE COURT:  That's fine.

12              And then for the defendant?

13              MR. GLOZMAN:  Good morning, your Honor.  For the

14      record, Vadim Glozman on behalf of Deny Mitrovich, who's

15      present and next to me.

16              THE COURT:  Are you ready to proceed with the

17      hearing?

18              MR. GLOZMAN:  We are, your Honor.

19              THE COURT:  So, let me ask, Mr. Mitrovich, if you've

20      had a chance to see the Presentence Investigation Report and

21      review it with your attorney.

22              THE DEFENDANT:  Yes.

23              THE COURT:  And, Mr. Glozman, other than the

24      objection to that five-level enhancement, do you have any

25      objections or corrections to any of the proposed Guideline

1    calculations or factual assertions in the PSR?

2         MR. GLOZMAN:  In talking with Probation, I don't

3    think it falls within the PSR, but there is a paragraph of

4    factual assertions in the recommendation that are inaccurate.

5         THE COURT:  Oh, in the recommendation?

6         MR. GLOZMAN:  In the recommendation.  It's just not

7    supported by the facts, and I don't think the government is

8    saying that it happened what it says in there happened.  So, I

9    don't know if I need to correct that for the record.

10         THE COURT:  I don't think that goes -- that's not

11   part of the PSR, so you can just make your argument; but

12   there's not anything that needs to be formally corrected.

13         MR. GLOZMAN:  Understood.

14         THE COURT:  Government, any objections or corrections

15   from your end?

16         MR. ERSKINE:  No, your Honor.

17         THE COURT:  All right.  So, why don't we talk about

18   the Guidelines issue first.

19         And just for the record, we're all here in court.

20   We're not on Zoom.  The COVID order or the CARES Act order

21   expired earlier this month.

22         So, there's a five-level enhancement that the

23   Probation Office proposes and that the government agrees under

24   2G2.2(b)(3)(B) for knowingly engaging in distribution in

25   exchange for valuable consideration.

1          And the defendant made, I'd say, four arguments

2    against the application of that enhancement.  And I'd like to

3    discuss and focus on the fourth one, which is -- keys on the

4    particular language in the commentary that defines the phrase,

5    "The defendant distributed in exchange for any valuable

6    consideration."

7          And the commentary states that that phrase means

8    that the defendant agreed to exchange with another person,

9    under which the defendant knowingly distributed to that other

10   person for the specific purpose of obtaining something of

11   valuable consideration from that other person, such as child

12   pornographic material.

13         And what the defendant is arguing is that the way

14   that phrase is defined in the commentary, it requires an

15   individual-to-individual trade, and that peer-to-peer networks

16   or communities where you post things in exchange for being

17   able to participate in the online community doesn't count.

18         And in support, the defendant cites *U.S. versus

19   Halverson*, which is a Fifth Circuit case from 2018.

20         So, let me ask the government for your thoughts on

21   that issue; and if you could address whether you think that

22   *Halverson* is distinguishable from this case, and if so, why;

23   and whether or not you think it's distinguishable, whether you

24   think it's correctly decided, and if so, why -- if not, why

25   not?

1          MR. ERSKINE:  Your Honor, so, I think that the

2   enhancement should apply because I think it's common --

3   commonly accepted that one of the -- a rule of construction,

4   you know, often includes interpreting person both in the

5   singular and the plural.  I don't -- I don't think it is a

6   reasonable construction, interpretation of that commentary to

7   think that this enhancement would apply only if this were a --

8   were distributed to an individual, but not to the -- you know,

9   the more damaging situation of multiple individuals, where you

10  had multiple individuals agreeing to a practice.  I think that

11  that is -- is an unreasonable interpretation because of the --

12  because of the outcome that would come from it.

13          So, I think this is a situation where you have, you

14  know, the defendant agreeing with each person who was -- you

15  know, individually, even though they didn't know each other,

16  who was part of the community, who were signed-up members, who

17  were familiar with the terms, the requirements of membership,

18  and essentially, on a one-on-one basis multiple times over

19  that agreement, a *quid pro quo* understanding that involved

20  the, you know, exchange for value of something of value for

21  additional access to child pornography.  So that's exactly

22  what happened here.

23          And I apologize.  As I sit here, I don't recall the

24  facts of that Fifth Circuit case, but if it -- to the

25  extent -- does it involve the -- essentially, the seeding

1    process of just a peer-to-peer torrent-style distribution?

2           THE COURT:  I think so.  And the reason -- I didn't

3    come up with *Halverson* on my own.  It was cited in the

4    defendant's brief.

5           So, Mr. Glozman, maybe you can speak to the facts of

6    the *Halverson* case.

7           MR. GLOZMAN:  Your Honor, I think *Halverson* is almost

8    as identical to this case as it comes.  The only difference is

9    in *Halverson*, it was a peer-to-peer network, as opposed to

10   here, where it was a forum.

11          And what happened in *Halverson* was by making

12   available the defendant's materials for other people to

13   download, the network would give them preferential -- I think

14   the quote is, "preferential access to more child pornography."

15   So, the people who would download it, and the website was the

16   one who would give them preferential access.

17          This is exactly what is alleged here.  Mr. Mitrovich

18   would post links on the website for other people to see, and

19   then the website would give him access to other portions of

20   the website that he otherwise would not get.

21          So, I think what's missing from the government's

22   argument is it has nothing to do with if it's an agreement

23   with one person or two people or whatever it is.  It's if it's

24   one thing for another.

25          And what happens here is the child pornography is

1 being made available downward for the people, but the people

2 aren't the ones who are giving him preferential access or

3 access to other parts.  It's the website is.  So, there's two

4 separate parties here working, and it's not an exactly

5 one-for-one exchange like the Guidelines contemplate.

6       And I don't see much of a factual distinction between

7 *Halverson* and here, your Honor, aside from the fact that

8 *Halverson* was peer-to-peer and this is a forum.  Both are

9 preferential access in exchange for sharing.  *Halverson* said

10 that's not what the Guidelines are talking about.  You don't

11 get the five points.  And I think the same applies here.

12       And I don't want to concede, your Honor, that

13 Mr. Mitrovich was even distributing here.  What's happening

14 here is he was posting links.

15       THE COURT:  Okay.  That argument, I'm not -- I don't

16 think that's your best argument, to put it kindly.

17       MR. GLOZMAN:  Understood, Judge.  But I think this

18 case should be decided the same way *Halverson* was.

19       THE COURT:  Yeah.

20       MR. ERSKINE:  And, your Honor, if I could just

21 respond.

22       THE COURT:  Oh, of course.

23       MR. ERSKINE:  And, your Honor, I did suspect that it

24 was a peer-to-peer torrent-style situation, where you do

25 not -- in those -- with peer-to-peer file sharing, individuals

1  often are not even aware of the fact that they are making

2  available to others, you know, the child pornography.  And

3  even if in the *Halverson* case that person was aware, it wasn't

4  a precondition to being able to access any child pornography.

5  The biggest difference between that set of facts and

6  this case is it wasn't sort of a range of access.  It was

7  binary.  Either you had access or you did not have access.

8  And the only way you could stay in good standing and have

9  access is if you gave, is if you contributed, consistent with

10  the requirements of the website.

11  And I'm not -- the individuals who are administering

12  the website, it's not as though they were some third-party

13  people who just liked maintaining forums.  They were also

14  consumers and producers -- and providers of child pornography.

15  So, to the extent you're looking for someone specific or a

16  collection of people specific, the administrators of the

17  website were also individuals engaged in the consumption and

18  distribution of child pornography.

19  MR. GLOZMAN:  We don't know that, Judge.

20  THE COURT:  Sorry.  You can continue.

21  MR. ERSKINE:  So, the -- again, because this is a

22  binary situation and it was explicit -- the terms of access to

23  the website, this is not akin to the facts, as I understand

24  them, in *Halverson*.

25  THE COURT:  So, what you're saying is that the

1     one-to-one -- and by one-to-one, I don't mean one piece of

2     pornography to another piece of pornography. I mean one

3     person to another person, the defendant to another person.

4           So, you're saying that the other person in the

5     equation is not somebody who viewed the material that

6     Mr. Mitrovich posted. Rather, you're saying that that other

7     person is the administrator of the forum, who in exchange for

8     Mr. Mitrovich posting the material gave Mr. Mitrovich valuable

9     consideration, meaning preferential access to the forum?

10           MR. ERSKINE: I'm saying it's both, your Honor, but

11     I'm just responding to a distinction that defense counsel --

12     I understood him to be drawing, which is that the person

13     setting -- controlling the access was different from other

14     consumers, which is true.

15           You know, it's our -- it's the government's position

16     that even as to the other people who are knowingly

17     participating in this system of sharing and of required

18     contribution for continued access, administrator or not,

19     those -- or let's just say a non-administrator would count as

20     well for the kind of exchange -- *quid pro quo* relationship

21     that would call for the enhancement.

22           But just responding to the specific argument of

23     defense counsel, to the extent you're trying to find someone

24     who is sort of more -- perhaps more explicitly in a *quid pro*

25     *quo* relationship or to a higher degree, you could look at the

1    administrators of the website because these are the ones who

2    are effecting the requirement and who, in response to the

3    defendant's contributions, you know, approved continued

4    access.

5            And again, it's -- these are individuals who are

6    themselves, you know, engaged in the running and the

7    consumption and the contribution of child pornography.  So,

8    it's not as though it's just some third party individuals who

9    have no idea about the child pornography nature of what's

10   going on.  They are themselves involved.

11           So, both categories represent individuals with whom

12   the defendant was exchanging or providing access to child

13   pornography or providing child pornography in exchange for

14   the defendant's continued access to child pornography.

15           THE COURT:  Why don't I ask that you address the

16   issue of the administrator of the forum, and why can't that

17   person be the person on the other side of the transaction for

18   purposes of this Guideline and for purposes of the analysis

19   that the Fifth Circuit set forth in *Halverson*?

20           MR. GLOZMAN:  Because, your Honor, we don't know if

21   they were.  We're just guessing if they were consuming it or

22   not.  They could be just running --

23           THE COURT:  They don't need to consume it, though.

24   They just need to accept it.

25           MR. GLOZMAN:  They're not -- I think in *Halverson*,

1   Judge, what the government's saying, it's not for continued
2   access.  *Halverson* actually said, if you shared more, you'll
3   get preferential access.  And that's the same thing that was
4   happening here.  If you shared, you got preferential access.

5           And the sharing -- you're not sharing with the
6   website.  You're sharing with the consumers.  The
7   administrator's not a consumer.

8           THE COURT:  But it doesn't have to be -- the person
9   on the other side of the transaction doesn't have to be a
10  consumer, does it?

11          MR. GLOZMAN:  I understand, Judge, but if you're
12  trading one thing for another thing, which is what the
13  Guidelines are asking you to do.

14          THE COURT:  Right.  You're trading -- a person who
15  participates on The Love Zone trades pornographic -- child
16  pornographic material for preferential access to the forum.

17          MR. GLOZMAN:  But he's not sharing it with the forum
18  or with the administrator.  He's sharing it with the people
19  who watch it.

20          THE COURT:  Well, why can't it be both?  He is
21  sharing it with the administrator.  He's distributing it to
22  the administrator.

23          I think you're just using the word "sharing" as a
24  synonym for consuming -- or you're saying that in order to
25  share child pornography, the person with whom you are sharing

1    it has to consume what you're providing; and that's not -- I
2    don't see why that's true.

3          MR. GLOZMAN:  I think that's what's contemplated by
4    the commentary of the Guidelines, your Honor.

5          MR. ERSKINE:  And, your Honor, to that point, it
6    could be -- this is a case where the thing of value that's
7    being provided is child pornography, but you can imagine a
8    situation where it's just money or it's drugs or something
9    else.  And the -- you know, the person -- what matters is
10   giving something of value, and in response, you're receiving
11   something back.  You're receiving the child pornography back.

12         THE COURT:  Okay.  Any final thoughts, Mr. Glozman?

13         MR. GLOZMAN:  What the Guideline contemplates is
14   distributing child pornography.  So, in order for -- it has to
15   be distributed.  You're not -- if you're just posting
16   something and someone doesn't consume it, you're not
17   distributing it.

18        If I put money on the table and no one takes that
19   money, they're not taking that money.  It's just there.
20   You're not distributing that money to anyone, or drugs.

21        So, there has to be a consumer on the other end for
22   it to get distributed.  This isn't just if you share something
23   and you make it available and you get something for it, you
24   get the Guideline.  You have to distribute it for something of
25   value.  In order to distribute it, there has to be someone on

1   the other end of it, your Honor.

2           THE COURT:  Yeah.  And then the question is:  What

3   does that person on the other end do with it?

4           MR. GLOZMAN:  But that person who gets it has to be

5   the one --

6           THE COURT:  Let's say the person who gets it has no

7   interest in it, but knows that it has pecuniary value, so goes

8   around and sells it to somebody else who consumes it.

9           MR. GLOZMAN:  But you're not -- the administrators

10  here aren't asking for them to take it and do what they want

11  with it.  They're asking them to share it with the people who

12  are coming on their website.  They're not saying, "Hey, give

13  it to me and then I'll do whatever I want with it."  It's

14  like, "No, you do it so people see it."

15          THE COURT:  Right.  I agree with you on that point,

16  but I'm not sure it yields the conclusion that you think it

17  yields.  I think the government has the better of the argument

18  here.

19          The Guideline, as I mentioned, is 2G2.2(b)(3)(B),

20  which says that there's a five-level enhancement if the

21  defendant distributed child pornography in exchange for any

22  valuable consideration, but not for pecuniary gain.

23          And distribution is defined in the commentary as,

24  "any act, including possession with intent to distribute,

25  production, transmission, advertisement, and transportation

1   related to the transfer of material involving the sexual

2   exploitation of a minor.  Accordingly, distribution includes

3   posting material involving the sexual exploitation of a minor

4   own a website for public viewing, but does not include the

5   mere solicitation of such material by a defendant."

6           If that's all the commentary said and didn't go on to

7   define "the defendant distributed in exchange for any valuable

8   consideration," this would be an easy case in favor of the

9   government because here, Mr. Mitrovich posted material

10  involving the sexual exploitation of a minor on a website for

11  public viewing.

12          What makes things complicated is this other

13  definition, which I think you could probably -- I think there

14  are reasonable arguments on both sides, but I'll give the

15  benefit of the doubt to the plaintiff here -- I'm sorry, to

16  the defendant here, and say that there has to be -- it has to

17  be an exchange where you give child pornography to a person,

18  and in return, that person gives something back to you.

19          And that person here, even under that understanding

20  of the definition of the phrase "the defendant distributed in

21  exchange for any valuable consideration," in applying the

22  standard that the Fifth Circuit laid out in *Halverson*, that

23  person is the administrator.

24          The defendant agreed to an exchange with another

25  person.  This is the four elements that the Fifth Circuit

1   laid out.  The defendant agreed to an exchange with another
2   person.  Here, that other person is the administrator, and
3   the exchange is the defendant will put -- upload pornography
4   to the forum that is run by the administrator; and in
5   exchange, the administrator gives the defendant,
6   Mr. Mitrovich, preferential access.
7        Two, the defendant knowingly distributed child
8   pornography to that person.  Yes, that's -- when you do the
9   upload, that's a knowing distribution of child pornography.
10       Three, for the purpose of obtaining something of
11  valuable consideration.  Yes.  That's getting the preferential
12  access to The Love Zone.
13       And four, the valuable consideration came from that
14  person, meaning the administrator.  And, yes, the
15  administrator is the one who gives Mr. Mitrovich preferential
16  access.
17       So, that -- that part of the analysis is satisfied.
18  So now I'm going to have to talk about the other three
19  arguments.
20       In terms of the -- you know, whether the defendant
21  knowingly made -- the defendant argues that he didn't
22  knowingly make his exploitative material accessible to others.
23  That argument I disagree with.  The whole point of The Love
24  Zone is to make material accessible to others, other people
25  in the forum.

1          In terms of -- another argument the defendant makes,

2    which is sending a hyperlink is not sufficient.  I disagree

3    with that.  There's no practical or legal difference between

4    posting say a JPEG or posting a hyperlink to a JPEG.  It's

5    practically speaking and legally speaking the same thing.

6          And in any event, the exhibit to the government's

7    response brief shows, by a preponderance of the evidence, that

8    given the size of the files of what the defendant posted, that

9    the defendant did do more than post hyperlinks.

10          The first argument that the defendant made is that it

11   can't be someone else's exploitative material.  What do you

12   mean by that?

13          MR. GLOZMAN:  Judge, I -- I think I disagree that

14   the government's exhibit made it seem by a preponderance of

15   the evidence that Mr. Mitrovich uploaded it.  They took

16   everything that was on his computer, all the images, all the

17   videos.  They have it.  And then they have this list that they

18   attached to their sentencing memorandum.  And it could have

19   easily looked, "Hey, does he have these files on his

20   computer?"  And they didn't.

21          It's different -- if there's a website and

22   Mr. Mitrovich copies the URL and pastes it in the forum,

23   that's not him uploading his own material.  Uploading his own

24   material is if it's on his computer, he possesses it, and it's

25   a link to that.  And they're no proof of that.

1      They could have easily proved that.  They could say,
2   "Look at these links.  He has the same videos or the same
3   pictures in his hard drive."  And there's no connection made
4   like that, Judge.  That's an easy cross reference to make.
5      So, if it's not his own, if he's not possessing it,
6   if he's linking it to a third-party website, that's not
7   distribution.
8      THE COURT:  I want to make sure we're talking about
9   the same exhibit.  It's an exhibit from The Love Zone.
10      MR. GLOZMAN:  Yes.
11      THE COURT:  And it shows things that Mr. Mitrovich
12   posted that are megabyte-sized, which isn't just a URL link.
13   It's a file.
14      MR. GLOZMAN:  I don't know that, Judge.  The
15   government -- it's their burden, and they have to show --
16   where does it say if you put a URL, you don't get a size of
17   the file?
18      The difference here is, Judge --
19      THE COURT:  It's just something we all know.  And the
20   size of a file, you could -- send a -- next time you're on
21   e-mail, send a URL and see what Outlook says about how many
22   kilobytes or megabytes there are.  I imagine it's going to be
23   in the kilobyte range rather than the megabyte range.
24      So, that's -- but even so, I don't even think it
25   legally matters whether it's a URL or either a 91-megabyte

1  file or a 268-megabyte file or a 46-megabyte file or a
2  232-megabyte file.

3          So -- but how about the argument that I was asking
4  you about, where I think you're saying in order to distribute
5  something, in order to be deemed to have distributed child
6  pornography, you had to have produced it?  Is that your
7  argument?

8          MR. GLOZMAN:  No, your Honor.  If it came across that
9  way, I apologize.  I meant --

10         THE COURT:  Well, then, I must have misread it.  So,
11 I apologize to you for misreading your argument.

12         Let me just focus in on what I was looking at,
13 because I want to make sure that I fully understand your
14 argument.

15         Well, maybe you didn't make any -- maybe I'm seeing
16 an argument that isn't there.  You -- one of your -- parts of
17 your brief talk about distributing someone else's exploitative
18 material, and I'm wondering how that fits in -- how that
19 concept fits in to the Guideline.

20         MR. GLOZMAN:  And that's what I meant, Judge, by
21 posting a URL.

22         THE COURT:  I see.

23         MR. GLOZMAN:  Because if it's on his hard drive and
24 he possesses it, I believe he can distribute that.  You don't
25 have to make the drugs to distribute the drugs, as long as you

1   have them to distribute it.

2          But if you just link to a URL that's got a video

3   streaming, that's not yours.  You're not possessing that.  If

4   I give a URL to a YouTube video of a music video or something,

5   that's not my music video; but if I have it downloaded on my

6   hard drive and I put a link to someone downloading it off my

7   computer, that's me distributing it.  That's the difference

8   I'm trying to make.

9          THE COURT:  Okay.  So, I think the two grounds --

10  it would be the second of the two grounds that I gave for

11  disagreeing with your argument about the hyperlink.  The

12  exhibit that the defendant submitted shows that what

13  Mr. Mitrovich was doing was more than just sending hyperlinks;

14  he was sending actual files.

15         And those -- you know, 50-megabyte, 200-megabyte

16  files, those are consistent with videos, so I find by a

17  preponderance of the evidence that that was what was happening

18  here.

19         So, the Guidelines range here is 135 to 168, which

20  is based on an offense level of 33 and a criminal history

21  category of I.  There are the other 3553(a) factors.  Why

22  don't I give Mr. Glozman a chance to take the first crack

23  at it.  I'll turn it over to the government.  Then I'll ask

24  Probation if you have anything to add.  Then we'll bring it

25  back to Mr. Glozman.  And then Mr. Mitrovich will have the

1  opportunity, though not the obligation, to address the Court
2  before sentencing.

3       With that said, Mr. Glozman, I read all the letters
4  that you submitted.  Will there be anybody else other than you
5  and possibly Mr. Mitrovich addressing the Court this morning?
6            MR. GLOZMAN:  No, your Honor.
7            THE COURT:  Okay.  Go ahead.
8            MR. GLOZMAN:  I don't think there's much left to say
9  about the crime that Mr. Mitrovich committed that hasn't
10  already been said or written or thought by anyone in this
11  case, including your Honor.  It's bad.  And it's as bad as it
12  sounds, and it's as bad as it seems.

13       And as Mr. Mitrovich comes before the Court here
14  today, I can assure you that there's no one else who
15  appreciates the seriousness and the gravity of the situation
16  more than him.  This case has been in the forefront of
17  Mr. Mitrovich's life for the past eight years, which is a
18  significant portion of his entire life.  I think it's about a
19  fifth of his entire life already this case has been pending.

20       And when any sort of case looms that long over a
21  person's life, it has deteriorating effects on them; but when
22  it's a case of this magnitude where the punishment is so much
23  more than just an anticipated jail term because of all the
24  collateral consequences, I think it affects a person's life
25  that much more significantly, and it certainly has with

1  Mr. Mitrovich.

2       Because although the case has only been in front of

3  this Court, your Honor, for what seems like four very long

4  years, I was on it for three of them, Mr. Mitrovich knew this

5  day would come even four years before he was indicted, when

6  the federal government came to his house and they imaged all

7  of his computers and let him know he was being investigated

8  for child pornography.

9       And so it's with a great deal of apprehension that I

10  try to do this, not because I lack any confidence in this

11  Court reaching a sentence that's reasonable and not greater

12  than necessary, but because it's so difficult to quantify

13  not only the punishment that Mr. Mitrovich has already

14  experienced, but then to also consider the punishment that

15  he's going to face as it compares to typical offenders.

16       And I've spent countless hours over the last three

17  years talking to not only Mr. Mitrovich, but to his father

18  before his passing and more recently to his mother, both

19  before and after her debilitating stroke.  And I don't think

20  I've ever seen the fear of a looming punishment manifest

21  itself so concretely in a client as much as I have with

22  Mr. Mitrovich.

23       And in talking with his family and as seen through

24  the character letters, I think it's obvious that Mr. Mitrovich

25  has become a shell of a person that he was before.  And even

1    in my own observation, from the time that I started

2    representing him and as we got closer and closer to

3    sentencing, I've seen him become even more of a shell of who I

4    first met.

5           You know, once in a while, there's a glimmer of hope

6    that comes in Mr. Mitrovich's eyes.  He starts talking about,

7    like, the lessons he's learned in therapy and through a book

8    called *Secrets* they made him read and *The Power of*

9    *Manifestation* and *The Power of Positivity*, but that's always

10   short-lived.  There's always a swift snapback to reality when

11   it comes to the realization that despite all the positive

12   changes that he could make in his life, what happens today

13   will be out of his control and a punishment that's going to

14   affect the rest of his life.

15          Obviously, Mr. Mitrovich has no one to blame but

16   himself.  He's here today because of the choices that he

17   made.  And as this Court knows, those choices came over a

18   four-month period of time from August of 2014 until December

19   of 2014.

20          And the government has gone in their memo into great

21   detail about what he did, and I'm sure they're going to today

22   also.  I don't need to belabor that.  And the Guidelines

23   certainly illustrate the seriousness of the crime.

24          But the punishment that the Guidelines advise in this

25   matter, your Honor, are not reasonable.  And I know the

1   charges are extremely serious, but what the Guidelines ask for
2   and what the government is asking for overstate the
3   seriousness of the offense, and it's not going to result in a
4   just punishment.

5           There are all of these enhancements that are tacked
6   on, but they're applicable in pretty much every single case
7   now.  And I don't need to go through the cases that I cited
8   in my memo or the policy arguments made by the Sentencing
9   Commission.  I know your Honor has read all of that.

10          What this Guideline range does, it reflects the
11  public disdain for these types of cases instead of accurately
12  reflecting what a just punishment would be based on the
13  individual circumstances.

14          And what happens in these cases, and it certainly
15  did for Mr. Mitrovich, is you use your computer to go on the
16  Internet, you download a Zip file that who knows how many
17  files are on it, you unzip it, and then you have hundreds of
18  files on your computer of things you never wanted or never
19  asked for or never intended on having.  And so because of one
20  download, you can have enhancements for using a computer, for
21  having over 600 files, which took one download; you have files
22  of people under 12 or masochistic images that you never wanted
23  because they were kept in this compiled file that you
24  downloaded from someone else; and then you keep it in a folder
25  that -- this is the distinction that I wanted to make from the

1  recommendation.  The folder that these were kept on here was

2  not a shared folder.  The recommendation talks about how all

3  of these 1200 files were made available to everyone worldwide.

4  That's not true.  They were just on a separate hard drive, and

5  the only thing made available was the 24 links that the

6  government put the exhibit on.

7  And you're sitting here with a person with little to

8  no criminal history, and you're stuck with Guidelines that are

9  more often than not for people who distributed on a mass

10  scale, which Mr. Mitrovich did not do, or for people who

11  induced or enticed children to participate in these things,

12  which Mr. Mitrovich did not do, or for people who produced the

13  material, which Mr. Mitrovich did not do.

14  And here, the government wants 11 to 14 years or

15  whatever it is for a person for all they know could have

16  gotten all of these files off of one Zip file, off of one

17  download, without asking for anything specific.  I mean, the

18  range of things on there is so broad, you don't know you're

19  asking for one thing, and you get all of these other things.

20  And they certainly didn't find on his computer any

21  search terms or posts for these materials that give him these

22  extra enhancements, for masochistic or even smaller kids.

23  It's all bad, Judge, but I think there's a scale that's

24  attached to it, and these Guidelines just tack it on.

25  And, you know, when it comes to Mr. Mitrovich, your

1  Honor, these terrible photos and videos that were downloaded,
2  it was done by a person who was probably in one of the darkest
3  places of his entire life.  You know, he had a childhood that
4  was filled with physical and emotional abuse.  He was expelled
5  from school.  He was a teenager that was taken advantage of by
6  an adult in the armed forces.  He was undiagnosed with major
7  depressive disorders.

8          He was 36, you know, 14 years of a loveless marriage
9  with no kids, no life partner, someone who was cheating on
10  him, had no respect for him, and a never-ending barrage of
11  self-hate and self-doubt and was contemplating and planning
12  his suicide, and self-medicating every single day for
13  20 years, daily alcohol, daily marijuana, weekly cocaine,
14  daily meth, all compounded over 20 years.

15          And when this all comes together, you find yourself
16  making decisions that you would never imagine making and still
17  can't understand how he ever made them or why he did.  And
18  Mr. Mitrovich cannot come to terms or understand what -- what
19  he did and why he did it.  It's just not who he is.

20          You know, there were polygraphs given to him by the
21  U.S. Attorney's Office that prove this.  There were federal
22  agents that went out and conducted multiple interviews with
23  family members who have children, with those minor children
24  themselves, and those interviews prove it.

25          And I think this is a way to differentiate

1 Mr. Mitrovich from the typical offender who is charged with

2 the same crime as he is. Because it wouldn't be fair if you

3 take two people on paper who have the same offense and the

4 same criminal history and give them similar sentences when

5 one's suffering from debilitating mental health concerns and

6 substance abuse issues and is not engaging in any sort of

7 dangerous activity in real life as opposed to the other

8 person.

9 And this doesn't excuse his behavior, but it gives us

10 a lens to see what he was going through when he did this.

11 I'm not asking this Court not to punish Mr. Mitrovich

12 for what he did. I understand the need for punishment. But

13 what I ask is that you consider these circumstances that led

14 him to doing what he did when crafting a reasonable sentence:

15 The fact that he had major depression that led to suicidal

16 thoughts because of a myriad of life circumstances; that he

17 was heavily drugged; that this was not someone who was

18 endangering the children around him in his life.

19 And when contemplating the sentence, this Court

20 should also consider how this punishment's going to be carried

21 out, because unlike other offenders who get sentenced by this

22 Court, Mr. Mitrovich will not be able to enroll in programs in

23 the BOP to get extra time off his sentence. He's not going to

24 be able to get First Step Act credit. He can't go to a

25 minimum security camp with other white-collar, non-violent

offenders.

He's going to be subject to assaults and other reprisals from inmates because of the nature of the crime. There's case law on that I think I cited, Judge.   And then he's going to be released as a registered sex offender for the rest of his life and subject to all the limitations that come with that.

He's not going to be able to use a computer or smart phone without being monitored while on supervised release. He's going to live with the public shame of being a sex offender, which I don't think can be understated.

And all of this comes eight years after federal agents came to his house with a search warrant.

And just as it's important to consider what Mr. Mitrovich was going through at the time he committed the crime, it's also important to look at what he did right when he got caught.   And he admitted everything to the agents right then and there.   There was no lawyer telling him what he should say or to mitigate his sentencing.

He gave them access to all his computers where he knew he had the contraband they were looking for.   He gave them the passwords to the websites that he was using.   He voluntarily took a polygraph test, two of them, I think.

He attempted to cooperate with the government; and it never amounted to anything, but I think the effort should

1 count for something.  It was through no fault of his own that
2 it didn't work out.  He just didn't have the information or
3 the connections to get the government what they were hoping
4 for, I guess.

5          And he quit using the drugs cold turkey.  After
6 20 years of daily use, he knew he couldn't keep using if he
7 was going to change his life.  He didn't want to do anything
8 to jeopardize the case that he knew was coming.  And to this
9 day, eight years later, he still hasn't used.

10          And he started doing therapy.  He finally got
11 diagnosed with his major depressive disorder.  He started
12 taking the medications, and he started implementing the
13 lessons he was learning in his life.

14          And he's maintained steady work, and he didn't let
15 the pandemic stop him like so many other people.

16          But the wait for today has been long and dreadful
17 because the uncertainty wears on a person, and it certainly
18 has on Mr. Mitrovich.  And the wait has been made that much
19 worse because despite all the positive steps that he's taken
20 in his life, despite the changes that he made to better
21 himself and make the most of the situation, the reality of the
22 charges and the reality of the time made these eight years
23 that much harder.

24          And he hasn't been able to use a smart phone or a
25 computer for over four years.  It's tough in a world that

1  almost exclusively relies on these types of devices now.

2  And Mr. Mitrovich's wife left him.  She refused to

3  keep working on their relationship.  She resented him.  She

4  moved out and is now threatening to use this conviction as a

5  leverage in divorce to get what she can from him,

6  notwithstanding the fact that Mr. Mitrovich was the main

7  financial supporter of the family throughout the marriage.

8  Many of his friends started to disassociate with

9  him.  One of his brothers disassociated with him.  His father

10  died, who despite the tumultuous relationship they had when

11  Mr. Mitrovich was younger really turned around and he became

12  his biggest supporter.  I got to know Mr. Mitrovich's father

13  fairly well, as well as I did Mr. Mitrovich.  And it pains me

14  to say those terrible things about him because I know he had

15  changed his life around, and now that he's gone,

16  Mr. Mitrovich's life is that much harder.  You know, he really

17  ended up being his best friend after he started losing

18  everything.

19  It's almost ironic that when Mr. Mitrovich was an

20  innocent child, that the relationship he had with his father

21  was what it was, but when he was accused of such a terrible

22  crime, it was his father that was his biggest defender.

23  And then Mr. Mitrovich's mother recently had a

24  debilitating stroke.  I knew her before, and she's not the

25  same person that she was before now, and it's clear.

1    Mr. Mitrovich is terrified that depending on this
2  Court's sentence, that he may never get to see her again; and
3  she's pretty much all that he has left in this world since
4  everybody started abandoning him eight years ago.

5    Maybe the most heart-breaking, at least for me since
6  I'm a new father myself, is Mr. Mitrovich's relationship to
7  his own two-year-old son, or lack thereof.  Mr. Mitrovich has
8  never met him.  He's never got to hold his child or talk to
9  him or any of the typical fatherly duties that men, or at
10 least me, tend to take for granted.

11   He doesn't want to embarrass his child for what he
12 did or burden him with it.  He does not want his child to get
13 to know his father only to lose him to prison for however long
14 it will be.  Mr. Mitrovich just loves him and thinks about him
15 from a distance.  He sends him money every month, whatever he
16 can, just to make sure he's supported as best as he can given
17 the circumstances.

18   And the reality of the situation is that
19 Mr. Mitrovich will never be able to be much of a father to
20 him.  He'll be a registered sex offender.  If Mr. Mitrovich is
21 ever able to be part of his child's life and keep him ignorant
22 of what he did, he'll never be able to go see him in a school
23 play or watch him compete in a school sport or go to any of
24 his graduations or pick him up at school or be trusted to
25 chaperone him and his friends or whatever it may be, Judge.

1  I don't think he'll ever be able to be a father in any sense
2  of that word.

3         Your Honor, I can't even begin to presume the
4  difficulty of what you have to do here today, but I do
5  respectfully ask that you take all of these mitigating
6  circumstances into consideration, as well as the other ones
7  that I put in my memo, when you craft your sentence.  And we
8  ask you not only to look at the face of the allegations of the
9  government, but to look into the consideration of what led him
10  to do what he did and how he has acted and how his life has
11  been affected the last eight years, how he's changed himself.

12         What he did was wrong, and he's going to be the first
13  person to admit that; but we ask you to consider the principle
14  of parsimony embedded in 3553(a) when crafting his reasonable
15  sentence.  We understand the need to punish him for what he
16  did, and we're not trying to get around that.  It's necessary.

17         But look at what he went through as a child.  Look at
18  the mental health and substance abuse issues that he's
19  battled, the feelings of hopelessness, helplessness,
20  worthlessness that plagued him and still continue to plague
21  him today.

22         Look at what he's been through and what he's done
23  since he got caught, his cooperation, his sobriety, his loss
24  of nearly everyone close to him, and all the future punishment
25  and collateral consequences he's going to undoubtedly face.

1      You know, Mr. Mitrovich has done a lot over the last

2  eight years to try to get his life back on track, and I

3  commend him for that.  And I think in times like these, it's

4  easier just to give up and take what's coming, but that's not

5  what he did.  He has continued to try to better himself.  And

6  isn't that what we want to see from defendants, to not give

7  up, but to do what they can with themselves to make sure they

8  don't find themselves in a similar situation later in life?

9      You know, it may be hopefulness, or it may be

10  naivete, but I've always been of the mindset that sentencing

11  isn't just about punishing a person, but about putting them in

12  a situation that will help them rehabilitate and succeed in

13  life; sentences that should give people like Mr. Mitrovich

14  hope that people care about their well-being and their success

15  in life; sentences that will take into account what people

16  have gone through and will continue to have to endure;

17  sentences that will put them in a position to succeed instead

18  of fail when they are released, to get them the help they need

19  instead of locking them up without addressing the underlying

20  issues; and sentences that will encourage the positive steps

21  and changes that people like Mr. Mitrovich have made as

22  they've awaited their sentencing, instead of sentences that

23  will perpetuate a state of discontent with life.

24      But what the government asks for, a near Guidelines

25  sentence, will do none of that.  It will just punish, and it's

1 not going to take into account any of these other aspects of a
2 person's life and what these proceedings should be about.

3 You know, as I've said a couple of times today, your
4 Honor, I've gotten to know Mr. Mitrovich fairly well during
5 my time representing him, and I've gotten to know him both
6 from his own perspective and from the perspective I've gotten
7 from some of his family members. And from what I know about
8 him, Judge, if there's anyone who deserves another chance,
9 it's him.

10 He's a good person, and I say that unequivocally and
11 wholeheartedly. Put simply, Judge, he's not a lost cause.
12 He's made improvements in himself, and he can make so many
13 more. And he's got a lot of good to give, and I truly believe
14 that.

15 And we ask you, Judge, just to take that into
16 consideration. Sentence him through the laws of lenity and as
17 leniently as you see fit under the law.

18 THE COURT: Thank you.

19 Government?

20 MR. ERSKINE: Yes, your Honor. A couple of
21 preliminary things. There is forfeiture in this case.
22 Pursuant to the plea agreement, the hard drives are being
23 forfeited by agreement, so we'd ask the Court to include
24 that as part of pronouncing the sentence.

25 THE COURT: And I know there's a motion for a

1 preliminary order of forfeiture. I would be granting that
2 and entering the preliminary order of forfeiture, and then
3 there would be subsequent proceedings on that?

4 MR. ERSKINE: Yes, your Honor.

5 THE COURT: All right.

6 MR. ERSKINE: And then on the matter of restitution,
7 so, as I noted in the filing I made yesterday, as to all but
8 one of the victims, there's currently an agreed amount of
9 restitution. There's one victim; and there was a negotiation,
10 and we won't get into negotiation. It wouldn't be appropriate
11 to do so. But essentially, at this point in time, the
12 requested amount is for $5,000, and the government concurs in
13 that request.

14 And I set forth the -- essentially the relevant
15 information in the supplemental memorandum that is the
16 anticipated compensable expenses as well as the information
17 the government has with regard to the number of orders that
18 have been entered with regard to the victim.

19 So, the government supports that request, but
20 obviously, it's up to the judge to determine the amount of
21 restitution as to that defendant -- sorry, that victim.

22 And then, your Honor, the government is asking for a
23 sentence of 135 months, which we believe is sufficient, but no
24 greater than necessary, to accomplish the goals of sentencing.

25 As the Court is aware, the defendant had

1 approximately 1,296 images and approximately 539 videos of

2 child sexual abuse material on his computer at the time of

3 the search warrant. And some of those materials involved

4 sadism or masochism and other violence, as well as materials

5 involving the exploitation or sexual abuse of a toddler.

6 And those items are factored in to the Guidelines,

7 which I think speaks to the reasonableness of the Guidelines

8 as directing the sentence in this case.

9 But, you know, these days, it's very common to

10 criticize the Guideline as being out of date and being overly

11 harsh, but I'd just point to a few things that the Guidelines

12 really don't take full account of, either partial account or

13 no account at all.

14 So, I think one of the most telling parts of the

15 record is the defendant -- the fact that he contributed

16 24 times. And you saw those -- those rows in the sealed

17 exhibit of each time he contributed, and you can review and

18 have reviewed, I'm sure, the titles of those materials that

19 he was contributing.

20 And it went on for a period of months. And so it's

21 not merely downloading one Zip file and having things in there

22 that you didn't expect. It's not just that. It is this

23 purposeful distribution time and time again in order to ensure

24 that you have access so you can continue to consume this

25 exploitative, abusive material.

1    And then another thing that's not taken into account
2  in the Guideline is the fact that this entire -- all of this
3  horrible stuff took place on Tor, and the entire purpose for
4  this all taking place on Tor was that everyone knew it was
5  illegal.  Everyone knew that it was wrong; but they wanted to
6  do it anyway, and they wanted to do it in a way where they
7  could do it and not get caught.  And that consciousness, those
8  extra steps just demonstrate the knowing wrongfulness of the
9  conduct.
10    It wasn't someone just Googling and going down some
11  sort of rabbit hole on the Internet and ending up in the
12  public Internet -- you know, obviously, that would be
13  potentially criminal and wrong as well, but this was much
14  more methodical, when -- the defendant needed to download Tor.
15  He needed to learn the process for using it.  He needed to
16  access the site.  And then, of course, the continued uploading
17  to maintain access.  All of those things are a degree of plan
18  and thoughtfulness and not mere one-off mistake.
19    And then finally, your Honor, you know, we did hear
20  a lot of mitigation evidence from defense counsel.  We would
21  ask the Court to, of course, similarly consider all the
22  letters from the victims that were attached to the PSR about
23  the pain and abuse and trauma the victims experienced in their
24  lives and have experienced, not just at the hands of the evil
25  perpetrators who initially committed these crimes, but that

1   they continue to feel day in, day out because the materials

2   displaying their abuse continue to be accessed every day, and

3   the pain and suffering that it causes them and will continue

4   to cause them.

5           So, your Honor, for those reasons, the government

6   requests a sentence of 135 months.

7           THE COURT:  Okay.  Thank you.

8           Probation, anything you'd like to add?

9           MR. ALPER:  No, your Honor.  And for the record,

10  Michael Alper, U.S. Probation.

11          THE COURT:  I forgot.  I'm so sorry.

12          MR. ALPER:  No worries.  Thank you, Judge.

13          THE COURT:  Sure.

14          Mr. Glozman, anything you would like to add?

15          MR. GLOZMAN:  I want to talk about just for a second

16  the -- the restitution issue.  I agree we shouldn't go into

17  details of the negotiation.  We agreed to everything besides

18  one, Judge.  And what stopped the disagreement with this one

19  was there was a certain number discussed, and that was relayed

20  to the victim's attorney; and their position was --

21          MR. ERSKINE:  Your Honor, I would object to

22  discussing -- I mean, these are settlement kind of

23  conversations that shouldn't be brought to the Court's

24  attention about the negotiation of a settled amount.

25          THE COURT:  Why don't you -- I do need to make a

1  decision as to what the restitution is for this victim,
2  correct?

3       MR. ERSKINE:  Correct.

4       THE COURT:  So, what are your views -- so, I do need
5  to hear from Mr. Glozman his reasons for why it should be
6  something other than $5,000.

7       MR. ERSKINE:  And the government obviously has no
8  objection to defense counsel offering that position.  But what
9  I expect to be offered is more in the way of describing the
10 manner of negotiation rather than a sort of substance.

11      THE COURT:  Well, why don't you go ahead and tell me
12 what you --

13      MR. GLOZMAN:  I think Mr. Erskine is accurate, I
14 think, but I think it just bears to the reasonableness of the
15 number.  The number was agreed to if it were to be paid on the
16 day of sentencing, and absent that, it was doubled.  And to
17 me, that doesn't seem reasonable because we're agreeing to pay
18 that amount, and he doesn't have that kind of cash on hand so
19 it can't be paid today.  And so just to punish him because he
20 can't do it this day is what I'm objecting to, Judge.  Because
21 the number otherwise was acceptable, but because it's
22 impossible -- or not possible for him to pay right now is why
23 it was disagreed to, and that's my objection to it.

24      THE COURT:  So, what number do you think it should
25 be?

1          MR. GLOZMAN:  Half.

2          THE COURT:  2,500?

3          MR. GLOZMAN:  I think that's what we discussed.

4          MR. ERSKINE:  3,000.

5          THE COURT:  3,000?  And, government, is -- so, I know

6    it gets a little bit into negotiations, but is -- I do need to

7    know what the parties' positions are.  Is it the government's

8    position that it's 3,000 if paid today and 5,000 if paid at

9    some other point?

10         MR. ERSKINE:  No.  The government is not -- so, I

11   guess two things.  At this time, there's no conditional offers

12   being extended by anyone.  The victim is requesting a $5,000

13   restitution at this time, and the government is supporting

14   that request.

15         THE COURT:  Okay.

16         MR. ERSKINE:  And the payment doesn't need to be

17   today.  You know, it will be paid with restitution as the

18   restitution is paid.  And that's premised on -- we think that

19   that is supported by the expenses outlined in the materials

20   that I summarized in the filing yesterday, and in the -- and

21   in the specifics of the case.

22         I believe as to that victim, the defendant possessed

23   three images, so we think $5,000 is appropriate.

24         THE COURT:  What -- how were the amounts -- well, I

25   see that there are -- there's a chart on docket 145 at page 3

1  that lays out what the restitution is.

2      MR. ERSKINE:  And so I think it's going to be a

3  different docket number, your Honor.

4      THE COURT:  Well, I know.  So, how does victim No. 11

5  fit in with the images and the videos, the number of images

6  and the number of videos involved with these nine victims that

7  are listed on page 3 of docket 145?

8      MR. ERSKINE:  So, the -- there were three images and

9  no videos.

10      THE COURT:  I see.  Of No. 11?

11      MR. ERSKINE:  Correct.  Though -- so, to the extent

12  the Court is considering something other than five, we would

13  ask that the Court at a minimum take the upper 1 over N

14  number, which is $3,986.72.

15      THE COURT:  All right.  Go ahead, Mr. Glozman.

16      MR. GLOZMAN:  Your Honor, I just -- I'm asking for

17  3,000.  I think 1,000 per image is fair.  It was --

18      THE COURT:  All right.  I mean on other issues.

19      MR. GLOZMAN:  Oh, on other issues?

20      THE COURT:  Yeah, anything else you'd like to

21  address.

22      MR. GLOZMAN:  No, your Honor.  Like I said before,

23  I'm not going to sit here and talk about it not being as

24  serious as it is.  It is serious.  I just hope your Honor can

25  take the other mitigating circumstances within the framework

1  of 3553(a) in crafting a well-below-Guidelines sentence.

2          THE COURT:  All right.  Thank you.

3          Mr. Mitrovich, if you'd like to make a statement to

4  the Court, you don't have to, but if you'd like to, now is

5  your time.

6          THE DEFENDANT:  Okay.  Dear Honorable Judge, I, Deny

7  Mitrovich, would like to start by saying how truly sorry I am

8  for my actions I had taken.  Although I had considered myself

9  a law-abiding citizen, I had broken the law.  Up to the

10  incident, my previous record can attest to my honesty in that

11  statement.  I had no intention of hurting anyone nor breaking

12  any laws, let alone federal.

13         My curiosity had taken over me, and I started

14  researching the dark websites.  I realize now that that was

15  the biggest mistake that I ever made in my 44 years of life.

16  And this is costing and changing the rest of my life forever.

17         There's not a single day that goes by without me

18  regretting that I should not have gone on those sites.  Since

19  2015, I cooperated and assisted to amend for my past conduct.

20  It just felt like everything was downhill for me since then.

21         My wife was worn down by all this, and we shortly

22  separated soon after.  My former lawyer Barry lost his license

23  around that time and could not represent me any further.  I

24  then had to borrow money from family and friends to acquire

25  my current lawyer.

1          My father fell sick from a severe stroke and died.

2  Several months later, my mother also was stricken with a minor

3  stroke and never fully recovered.  I was completely left on my

4  own to deal with this serious situation.

5          I truly thank God for my current lawyer, who helped

6  me and treated me as a human being.  I also thank God for the

7  help I received from counseling and psychological treatment.

8  These three things helped me through the hardest, darkest, and

9  most trying time of my life.

10          I am not the person the prosecution paints me out to

11  be, and I feel the system perceives me as a monster.  I am a

12  truly caring and giving and godly person.  I always put

13  family, friends, and even strangers' welfare above my own.  I

14  would give the shirt off my back to help anyone in need.

15  Anyone who knows me would tell the same.

16          I made a mistake that put me in a terrible position,

17  and it's no one's fault but mine.  I am truly sorry for my

18  actions.  I'm sorry that my stupidity caused me to break the

19  law.  I regret everything I did from day one, and have

20  suffered greatly from the last eight years of my life as a

21  result.

22          And because I affected the family and victims, I did

23  everything possible to fix all the wrong that was done.  I ask

24  that you see me for who truly I am and not a predator.  I ask

25  you to rule truly and fairly considering all factors of my

1   case.   No words can convey how sorry I am about my actions.

2         THE COURT:  Thank you, Mr. Mitrovich.

3         Anything further from the government?

4         MR. ERSKINE:  No, your Honor.

5         THE COURT:  Mr. Glozman?

6         MR. GLOZMAN:  No, your Honor.

7         THE COURT:  Okay.  I want to thank both counsel for

8   their very fine work in the briefs that you submitted and in

9   your presentations here this morning.

10         And I want to thank the probation officer for his

11   excellent work in this case.  And again, apologies for not

12   having you make your appearance at the beginning of the

13   hearing.

14         And I want to thank everybody who wrote letters on

15   Mr. Mitrovich's behalf.  To me, those were very helpful to me

16   in evaluating what I need to evaluate, which is not just the

17   crime, but also the person.  So, I appreciate those letters

18   as well.

19         The governing statute, 18 USC 3553(a), requires me

20   to consider seven sets of factors, and I'll address them in

21   turn.  The first factor will require the most extensive

22   discussion, and then the other six will require less

23   discussion.

24         So, the first factor requires me to consider the

25   nature and circumstances of the offense and the history and

1  characteristics of the defendant.  The offense is gravely
2  serious.  It's possession of child pornography.  There were
3  three hard drives, including images of prepubescent minors
4  and minors under 12 years old.

5        So, beginning on or about August of 2014,
6  Mr. Mitrovich used the Tor, which I guess is an acronym for
7  The Onion Router, to access a website, a forum called The Love
8  Zone, which is an online bulletin board dedicated to sharing
9  child pornography.  Under the site's rules, members were
10  required to periodically upload child pornography to the site
11  in order to maintain the ability to download child
12  pornography.  And from August through December of 2014,
13  Mr. Mitrovich contributed about 24 times.  And this is set
14  forth in the exhibit that the government filed on
15  October 18th.  It's docket 146.

16        So, as I mentioned, there were three -- in terms of
17  the possession, there were three hard drives, together about
18  1300 images of child pornography, and over 500 videos.  They
19  included items involving sadistic and masochistic conduct,
20  sexual abuse and other violence, and in at least one instance,
21  the sexual abuse or exploitation of a toddler.

22        This material -- the reason why it's so severely
23  punished is because the creation -- the production of the
24  material and then the subsequent possession and distribution
25  of the material creates tremendous and lifelong harm to the

1  children who are depicted in the images and the videos.  And
2  each time somebody else possesses those images or videos,
3  they're re-victimized.  And each time that somebody shares
4  those images or videos, whether it's a one-on-one situation,
5  or whether posting to a forum, they're re-victimized as well.

6  And the victim impact statements that are attached
7  to the Presentence Investigation Report lay out far better
8  than I can articulate the harm that these victims have felt,
9  continue to feel, and will for the rest of their lives
10 experience due to the production of the child pornography,
11 which I know that Mr. Mitrovich is not responsible for, but
12 for the possession and the sharing of that child pornography.

13 In terms of the circumstances of the offense, this
14 took place over the course of four months, so there was
15 plenty of time for reflection and re-assessment; and that did
16 not happen over the course of those four months.

17 And, you know, to Mr. Glozman's point about when you
18 download a Zip file, you don't quite know what you're going to
19 get, and I understand that.  And I think it's a good point.
20 But what we have here, we don't have just one download here.
21 And if we did, it would be a different case.

22 But it's -- Mr. Mitrovich went to a forum, The Love
23 Zone, through the Tor network, which is a clandestine network.
24 And the forum is a place where pornography -- the purpose of
25 the forum is to show child pornography and share child

1  pornography with other people who like to watch child
2  pornography.  And Mr. Mitrovich contributed 24 times.  And
3  what this chart shows is that he contributed in August, in
4  September, in October and November.

5       And what the posts indicate that these images or
6  videos, some involved a 14-year-old.  Some involved an
7  11-year-old, then a nine-year-old, and then a six-year-old.

8       So, it wasn't just somebody got a Zip file and didn't
9  quite know what was inside and that was that.  This case
10  involves much more than that, and that -- that accounts for
11  that five-level enhancement we talked about at the beginning
12  of the hearing.

13       In terms of Mr. Mitrovich's history and
14  characteristics, he's 44 years old, a United States citizen.
15  There's no criminal history, really, to speak of.  He was
16  born and raised in Chicago.  As the PSR lays out, and as
17  Mr. Glozman described in the memorandum, Mr. Mitrovich's
18  father, at least at that point was physically and emotionally
19  abusive.

20       The PSR describes and Mr. Glozman reiterates in his
21  brief when Mr. Mitrovich was 16, he had a rather extended
22  sexual relationship with a 32-year-old woman, and
23  Mr. Mitrovich at that time was a minor.  I'm taking that
24  into account.

25       Mr. Mitrovich's relationship with his father was

1    repaired.  He recently passed away.  And Mr. Mitrovich remains
2    close with his mother, who has severe health issues arising
3    from the stroke that she recently experienced.

4         Mr. Mitrovich has been married since 2000, although
5    he's in the process of divorce.  He has a young son with
6    another woman, and he does not have contact with that son,
7    although he does provide financial support.

8         Mr. Mitrovich is in good physical health.  He does
9    have some mental health issues.  There was one severe
10   depressive episode when he was a teenager.  Since the FBI
11   searched his home in 2014, he suffered from depression,
12   anxiety, and insomnia, which is certainly understandable,
13   given the situation.

14        The defendant's brief references a severe episode
15   of major depressive episode, but that happened -- my
16   understanding of the PSR is that that happened after he was
17   charged in this case and not during the offense conduct.

18        The PSR also reflects, and Mr. Glozman has emphasized
19   in his brief, that Mr. Mitrovich has had substance abuse
20   issues, alcohol, marijuana, cocaine, and methamphetamine
21   before the 2014 search of his house, and that Mr. Mitrovich
22   has been working on and relatively successfully dealing with
23   those substance abuse issues over the last four years.

24        And, you know, to Mr. Glozman's point about the
25   substance abuse issues and the mental health issues, I

1  understand that that -- both of those things, either or both
2  of those things, affect a person and affect the way that they
3  view life; but I'm having a hard time drawing a causal
4  relationship between those substance abuse and mental health
5  issues and what Mr. Mitrovich did in this case.

6      And to the extent that there is a causal
7  relationship, I think at most, it's very tenuous; and that's
8  just because there are untold numbers of people who have
9  substance abuse issues, untold numbers of people who have
10  mental health issues; and for nearly all of them, it doesn't
11  trigger the kind of behavior that Mr. Mitrovich engaged in
12  here.

13      And again, it's not just being curious and being in a
14  state of either depression or being under the influence of
15  drugs and coming across a Zip file and having a momentary
16  lapse and taking possession of things that he shouldn't have
17  taken possession of.  There was -- you know, it took a lot of
18  wherewithal to get on the Tor network, to join this Love Zone
19  website, and to time and time again, 24 times over four
20  months, contribute material.

21      I don't think that can be laid at the feet of the
22  substance abuse issues and the mental health issues that
23  Mr. Mitrovich was suffering from at the time.

24      He's a high school graduate and has taken post
25  secondary classes and obtained certificates in various trades,

1 which is to his credit.  Mr. Mitrovich has a decent employment
2 history.

3           He has been largely compliant with the conditions of
4 pretrial release.  And Mr. Mitrovich admitted his guilt and
5 received three levels' credit for that.

6           He was -- I don't know whether what he did rises to
7 the level of cooperation in the 5K1 sense, and according to
8 the government, it doesn't; but just colloquially speaking,
9 since the search of his home, Mr. Mitrovich has cooperated
10 with the government in terms of giving passwords and access
11 to all the materials, and that's something in his favor that
12 I'm considering.

13           As I mentioned, I read all the letters submitted on
14 his behalf.  There are letters from his mother, brother,
15 brother-in-law, and a number of friends; and those letters,
16 as you might imagine, speak very positively about
17 Mr. Mitrovich's personal characteristics and how he is a good
18 son, a good brother, and a good friend to those individuals.
19 And that's something that I'm considering, and I'm also
20 considering Mr. Mitrovich's allocution, where he expressed
21 remorse, and I believe his remorse is sincere.

22           The second set of factors requires me to consider
23 the need for the sentence imposed to accomplish the various
24 purposes of criminal punishment.  The first purpose is to
25 reflect the seriousness of the offense, to promote respect

1  for the law and provide just punishment for the offense.  I've
2  already talked about how serious the offense conduct is, and I
3  won't repeat myself.

4       The second purpose is to afford adequate deterrence
5  to criminal conduct.  And what that means is that it has --
6  the sentence has to send a message to the community at large
7  that if you're going to engage in this kind of conduct, the
8  penalty is going to be severe; and, therefore, it's best to
9  desist and refrain, rather than go forward with it.  And the
10 sentence will accomplish that goal.

11      The third purpose is to protect the public from
12 further crimes of the defendant.  And with this kind of crime,
13 there's always a risk, moreso than in the mine run case, of
14 recidivism, just given the nature of the crime.  That said,
15 this will be Mr. Mitrovich's first time in prison.  It will
16 undoubtedly have a greater impact on him than it would on
17 somebody who's been in and out of custodial settings.  And the
18 time in prison will be difficult because Mr. Mitrovich will
19 not be able to avail himself of programs and opportunities,
20 given the nature of -- that other -- other inmates convicted
21 of different crimes are able to take advantage of.

22      There's also the post incarceration collateral
23 consequences that are going to be imposed on Mr. Mitrovich
24 that will make it less likely that he's going to re-offend.
25 And then there's the fact that over the last eight years,

1    Mr. Mitrovich has taken great steps towards achieving sobriety

2    and addressing the mental health issues that he was facing.

3    And that -- whether or not there is a causal relationship

4    between substance abuse and mental health issues on the one

5    hand and engaging in this kind of criminal conduct on the

6    other, the fact that Mr. Mitrovich is taking steps at

7    self-improvement in and of itself is a positive indicator

8    for when he is released from prison.

9         The third factor are the kind of sentences available.

10   There's a 20-year maximum sentence of imprisonment.

11        The Advisory Guidelines range is 135 to 168 months.

12   We talked about that at the beginning of the hearing.

13        Mr. Glozman made an argument that is often made in

14   these kinds of cases, which is the enhancements for using a

15   computer, the enhancement for possessing large numbers of

16   images and videos, are historic relics that don't account for

17   the technological advancements that make those

18   characteristics, using a computer, possessing large numbers

19   of images and videos, widespread and very common among

20   individuals who are convicted, whether by way of trial or

21   plea, of committing this kind of crime.

22        I understand the argument.  I don't find it

23   persuasive.  I don't think it matters whether some, most,

24   or all defendants convicted of child pornography offenses

25   use a computer or whether they possess over 600 images.  The

1  more images, the more harm; and the more harm, the greater
2  the punishment.  And that's what the enhancement is designed
3  to do.

4          And when you use a computer, as opposed to the way
5  it used to be done in the pre-computer age, there's easier
6  and more frequent transmission of child pornography that
7  causes more harm; and again, that warrants greater punishment,
8  which is accomplished by the enhancements.

9          So, I understand the challenge to the Guidelines.  I
10 just don't find those particular challenges persuasive.

11         The fifth factor are Guideline policy statements.
12 There are none that have -- I haven't -- there are none that
13 have been expressly addressed.

14         The sixth factor is the need to avoid unwarranted
15 sentence disparities among defendants with similar records
16 who have been found guilty of similar conduct.  The Seventh
17 Circuit, in talking about subsection (a)(6), says that it
18 generally weighs in favor of a Guidelines sentence because
19 the Guidelines are about uniformity, and so is this sixth
20 factor.

21         That said, I understand just from my own experience
22 and from looking at the materials that the Sentencing
23 Commission puts out and from Mr. Glozman's brief that there
24 are many below-Guidelines sentences in this particular area,
25 as well as other areas, and so I'm taking that into account

1  as well.

2          And the seventh factor is the need to provide

3  restitution to any victims of the offense.  There is

4  restitution in this case, but there's -- it's not a -- it's

5  an important consideration, but in terms of what the custodial

6  sentence would be, I think it -- it is not as significant as

7  the other 3553(a) factors.

8          So, at this point, let me pause.  That's my take on

9  the 3553(a) factors.  Let me ask Mr. Glozman whether you've

10  made a main argument in mitigation that I haven't addressed,

11  because if so, I would -- I would like to address it.

12          MR. GLOZMAN:  I don't know if you -- I think you

13  kind of addressed it, but the only thing I talked about that

14  your Honor didn't mention was when the agents went out to

15  interview family members, and that he wasn't presenting any

16  kind of danger to them.

17          THE COURT:  Right, yes.  I am -- I did not mention

18  that, but I am aware of that, and I'm considering it.  And of

19  course, it's something that weighs in Mr. Mitrovich's favor.

20          So, I've considered everything that's been submitted

21  in writing and here at the sentencing hearing, and it's my

22  obligation to impose a sentence that's sufficient, but no more

23  than necessary, to fulfill the purposes of 3553(a).  And

24  having done so, I'm going to impose a sentence on

25  Mr. Mitrovich of 84 months, which is seven years.

1           It's a variance off the bottom end of the Guidelines

2    range, and the grounds for the variance are all the mitigating

3    factors that I've mentioned; and in particular, I want to

4    emphasize that this will be Mr. Mitrovich's first time in

5    prison, and as I mentioned, prison will be tougher on him

6    than on others who are imprisoned for different crimes.

7           There's the fact that Mr. Mitrovich has suffered and

8    will suffer non-custodial consequences.  The eight years that

9    this has -- he's been dealing with this -- again, he brought

10   it on himself, and he has nobody to blame but himself; but

11   eight years from the time of an arrest or a search and

12   sentencing is a long time, much longer than the average.  And

13   I wanted to give some consideration to the fact that this has

14   been something that Mr. Mitrovich has been dealing with for

15   eight years, and having this hanging over his head is

16   something that I wanted to consider.

17          There are the positive steps that Mr. Mitrovich has

18   taken since 2016 in terms of his substance abuse issues,

19   achieving sobriety, and mental health issues.

20          And then there are the -- the post-custodial

21   restrictions that he'll have to deal with for the rest of

22   his life.  Again, this is something that he brought on

23   himself.  He and only he is to blame for that.  But those

24   post-custodial restrictions are not insignificant, and it's

25   something that I wanted to account for.

1  　  　  You know, in terms of the five-level enhancement,

2  it ended up -- whether I gave the five-level enhancement or

3  not, I would have given the same sentence, and it would have

4  been a Guideline sentence had I agreed with the defendant on

5  what the Guidelines range is if that five-level enhancement

6  didn't apply.

7  　  　  And I actually don't think it matters because with

8  respect to that -- let's say I agreed with Mr. Glozman on a

9  technical application of the Guideline, that the Guideline

10  applied only in situations where the defendant exchanged

11  child pornography with somebody who was a consumer and who

12  gave something in return to Mr. Mitrovich.  I would think

13  that the Guideline was too narrow.

14  　  　  You know, sharing images and videos on a forum is

15  just as bad, if not worse, than the kind of conduct that would

16  be encompassed within the Guidelines -- within that Guideline

17  if I had -- in Mr. Glozman's understanding of that Guideline.

18  Why should it matter whether it's a person-to-person trade

19  where the other person was the consumer, as opposed to a

20  person-to-community or person-to-forum trade, where it doesn't

21  just go to one person, it goes to any number of people,

22  whoever is on that forum?  I actually think that that's worse

23  than a person-to-person trade where the person is the

24  consumer.

25  　  　  So, I -- even if I had agreed with Mr. Glozman on

1  that issue, I would have given the exact same sentence, and --

2  because I would have considered, although the Guidelines

3  range would have been 78 to 97, in my mind, I would be

4  thinking 135 to 168 because I would think that the Guideline,

5  if it was as narrow as that, in fact, was too narrow and that

6  the Commission made a mistake and should have included in that

7  five-level enhancement the kinds of things that Mr. Mitrovich

8  did.  And then I would go down for the reasons that I just

9  mentioned, to 84 months.

10  So, at the end of the day, the accounting with the

11  Guidelines didn't impact the sentence, the custodial sentence.

12  There's a $100 special assessment.  In terms of

13  restitution, it's agreed -- restitution is agreed as to 10 of

14  the victims, and we will -- I'll adopt that agreement.  As to

15  victim No. 11, I'll impose restitution of $3,000.

16  Just looking at the chart, you know, victim 11, there

17  were three images and no videos.  Looking at the chart where

18  there are victims who have either two images or four images

19  and no videos, they were all $3,000.  And so victim 11 ought

20  to be on par with those other similarly situated victims.

21  So, that's going to be the restitution.  I'll grant

22  the preliminary order of forfeiture and make that part of the

23  J&C.  I'm not going to impose a fine on Mr. Mitrovich.  He's

24  going to have this restitution obligation; and in terms of

25  whether the money should go to the government or the victims,

1  let's just make sure that the victims are paid, and then we

2  can leave it at that.

3  Supervised release, so, within 72 hours of when

4  Mr. Mitrovich is released from the custody of the Bureau of

5  Prisons, he'll need to report to the Probation Office in the

6  district to which he's released.  And he'll get instructions

7  on that when the time comes.

8  There's a five-year minimum term of supervised

9  release.  I'll impose a five-year term of supervised release.

10  You didn't have any objections to the proposed

11  conditions, did you, Mr. Glozman?

12  MR. GLOZMAN:  No, your Honor.

13  THE COURT:  So, under *U.S. versus Anglin*, 846 F.3d

14  954 at 969 to 970, you have the option.  I could read those

15  conditions into the record, and I'm happy to do so; or you

16  can waive the reading.

17  MR. GLOZMAN:  We'll waive them, your Honor.

18  THE COURT:  All right.  Let me ask Mr. Glozman, would

19  you or the defendant like a further explanation, elaboration,

20  or justification for the term of imprisonment, the term of

21  supervised release, or the supervised release conditions?

22  MR. GLOZMAN:  No, your Honor.

23  THE COURT:  Are there any remaining counts to be

24  dismissed?

25  MR. ERSKINE:  No, your Honor.

1          THE COURT:  Would you like for me to recommend a --
2     either a facility or a geographic region?
3          MR. GLOZMAN:  As close to Chicago as possible.
4          THE COURT:  Probation, do you think an RDAP
5     recommendation would be appropriate?
6          MR. ALPER:  Yes, your Honor.  I'd also request the
7     total amount of restitution.  I don't have the exact number.
8          THE COURT:  Okay.  Somebody needs to do the math on
9     that.
10          MR. ERSKINE:  I can do it.
11          THE COURT:  You can do it?
12          MR. ERSKINE:  I can do it right now.
13          MR. ALPER:  Thank you.
14          THE COURT:  So, I'll recommend the RDAP program.
15          And as I mentioned, the preliminary order of
16     forfeiture will be entered.
17          In terms of appeal rights, Mr. Mitrovich, although
18     you gave up a number of rights when you pleaded guilty, you
19     retained the right to appeal the validity of your guilty plea,
20     your sentence, and my July 2021 denial of your motion to
21     suppress and dismiss.
22          If you want to appeal any or all of those things, you
23     absolutely should, but you'll need to get your notice of
24     appeal on file within 14 days of the day that the sentencing
25     order is entered on the docket.

1          Do you understand that?

2          THE DEFENDANT:  Yes.

3          THE COURT:  Mr. Glozman, will you discuss with

4    Mr. Mitrovich his appeal rights?

5          MR. GLOZMAN:  I have, your Honor.

6          THE COURT:  And if he would like to file a notice of

7    appeal, will you be able to do so in a timely manner?

8          MR. GLOZMAN:  I will.

9          MR. ERSKINE:  Your Honor, the total restitution is

10   67,500.

11         MR. ALPER:  Thank you.

12         THE COURT:  So, where do things stand in terms of

13   custody and surrender date?  Government?

14         MR. ERSKINE:  Your Honor, the government is asking

15   for detention.

16         THE COURT:  And what's that -- is there a statute

17   that makes detention presumptive at this point?

18         MR. ERSKINE:  3143.  It actually would have been at

19   the time of the change of plea.

20         THE COURT:  Right.  So, it's 3143.  Is it (a)(2)?

21         MR. ERSKINE:  I believe so, yes.

22         THE COURT:  Or is it --

23         MR. ERSKINE:  It's subsection (a).

24         THE COURT:  Right.  Is this -- is this -- your

25   thought that detention was required at the time of the change

1   of plea and certainly now, is that based on the nature of the
2   conviction?

3          MR. ERSKINE:  Yes.

4          THE COURT:  Mr. Glozman?

5          MR. GLOZMAN:  Your Honor, Mr. Mitrovich has been on
6   bond for four years.  I think there was only one alleged
7   violation.  I would ask that he be able to stay out and
8   surrender.  And one of the reasons is he recently -- I think
9   you saw him walk in, had a major knee injury at work, and he
10  has an MRI scheduled for this Wednesday.  There's some missing
11  cartilage and some other things that need to be repaired.
12  We'd ask that he has time to surrender so he can get the
13  medical help that he's looking for.

14         THE COURT:  Probation, what are your thoughts?

15         MR. ALPER:  Your Honor, I'll defer to Justin Wiersema
16  from Pretrial Services.

17         MR. WIERSEMA:  Good morning, your Honor.  Justin
18  Wiersema from Pretrial Services.  We did file a report with
19  the Court.

20         THE COURT:  I saw it.

21         MR. WIERSEMA:  We do recommend that he be detained
22  today based on all the factors that the government just said.

23             There is one violation.  It is dated.  It was
24  actually back in January of 2020.  It's very minor, and it's
25  very dated; but there was a prior non-compliance submitted to

1    the Court.

2         THE COURT:  Right.

3         So, I mean, which -- why -- Mr. Glozman, why do you

4    think I ought to -- why do you think I have wiggle room in

5    terms of not taking Mr. Mitrovich in at this point?

6         MR. GLOZMAN:  I believe your Honor has the power to

7    order a surrender date.  I think in other presumptive cases

8    where detention is presumed upon conviction, it happens all

9    the time.  It's not mandatory detention.

10        So, I'd ask him to stay out because he's proven that

11   he can follow the conditions of supervised release.  The minor

12   alleged violation from January of 2020 I think was him going

13   in and out of his condo for 15 minutes when he wasn't supposed

14   to, which didn't make much sense logistically how it was, but

15   it doesn't matter.

16        He's been compliant.  He's got this major knee issue,

17   Judge, that he needs to get an MRI on to figure out what needs

18   to get done.  He's barely hobbling around.  We're not asking

19   that he stay out indefinitely.

20        THE COURT:  So, I think Probation cited 3143(a)(2),

21   and it says that the judicial officer shall order that a

22   person who has been found guilty of an offense in a case

23   described in a provision of 3142(f)(1) shall be detained

24   unless; and then it goes to (B), the judicial officer finds by

25   clear and convincing evidence that the person is not likely to

1 flee or pose a danger to any other person or the community.

2 Do you think that -- Probation, do you think that

3 there's a risk that Mr. Mitrovich will flee or pose a danger

4 to any other person or to the community based on what's --

5 how he's conducted himself until this time?

6 MR. WIERSEMA: No, Judge. We do not. But we feel

7 that since the defendant is facing this lengthy sentence, and

8 he's been on bond this long, things are going well, but we

9 think that is appropriate at this time.

10 THE COURT: Government, what are your thoughts?

11 MR. ERSKINE: I'm just reviewing 3143, because as I

12 recall it, it doesn't -- if I can have just a moment, your

13 Honor.

14 THE COURT: Of course.

15 MR. ERSKINE: So, your Honor, I believe you said the

16 judicial officer finds by clear and convincing evidence and so

17 on and so forth.

18 THE COURT: Right.

19 MR. ERSKINE: But it's the -- it's an "and," with the

20 first part. The government has to agree, too.

21 THE COURT: Right. You're right. It's (A) is the

22 judicial officer finds that there is a substantial likelihood

23 that a motion for acquittal or new trial will be granted, or

24 an attorney for the government has recommended that no

25 sentence of imprisonment be imposed; and then (B). And this

1   isn't a situation -- this is not a situation where there's
2   either (A)(i) or (A)(ii), so --
3        MR. ERSKINE:  Your Honor, but I will -- for the
4   completeness of your understanding, under 3145 --
5        THE COURT:  Yes.
6        MR. ERSKINE:  -- essentially, it boils down to --
7        THE COURT:  Exceptional reasons?
8        MR. ERSKINE:  -- at the bottom, if it is clearly
9   shown that there are exceptional reasons why the person's
10  detention would not be appropriate.
11       THE COURT:  So, let's do this.  Why don't we set the
12  surrender date -- is there going to be -- because after three
13  days, the residential restrictions kick in, right?
14       MR. GLOZMAN:  He has a new apartment that's -- he's
15  paid for a couple of months in advance, I believe, and it's in
16  a place where he's allowed to live.  We checked with the
17  police department, and I believe pretrial has made sure of
18  that.
19       MR. WIERSEMA:  Judge, that's what we've been told.
20  I have not seen a lease yet, but Mr. Mitrovich has given me
21  the details.  If the address is suitable, we anticipate he'll
22  move today or tomorrow because he does have to register within
23  three days, because the address that he's at now, he cannot
24  register at.  So, he does have to move to a registerable
25  address by Wednesday.

1          So, we've been in contact.  I haven't seen the

2    paperwork, but I believe that's where he's at.

3          THE COURT:  Okay.  Given the situation with

4    Mr. Mitrovich's knee, given his compliance thus far with the

5    terms of supervised release -- I'm sorry, pretrial release,

6    and given the situation with Mr. Mitrovich's mother, let's

7    have a surrender date of January 17th, 2023.

8          Will he be designated by then?

9          MR. WIERSEMA:  I anticipate so, yes.

10          THE COURT:  Okay.

11          MR. WIERSEMA:  As long as the order specifies that

12    surrender date, they'll prioritize that and likely get him

13    surrendered by then -- designated by then.

14          THE COURT:  And that will give Mr. Mitrovich a chance

15    to spend the holidays with his mother and take care of

16    whatever affairs he needs to take care of.

17          MR. GLOZMAN:  There's one thing I'll also ask, your

18    Honor, if that's okay.  For the MRI, he can't do it with his

19    electronic monitoring bracelet on.  If we can just have an

20    allowance for it to be taken off just for that day in the

21    morning and be put on in the evening so he can get the MRI

22    done.

23          MR. WIERSEMA:  No objection.

24          THE COURT:  As long as you work it out with the

25    Probation Office -- I'm sorry, the Pretrial Services, that's

1   fine with me.

2           Anything further from the government?

3           MR. ERSKINE:  No, your Honor.

4           THE COURT:  Mr. Glozman?

5           MR. GLOZMAN:  I just want to say something off the

6   record after we're done.

7           THE COURT:  Sure.  Pretrial?

8           MR. ALPER:  Nothing, Judge.

9           THE COURT:  All right.  Thanks.  We'll conclude the

10  case.

11    (Which were all the proceedings heard.)

12                        CERTIFICATE

13    I certify that the foregoing is a correct transcript from

14  the record of proceedings in the above-entitled matter.

15

16  */s/Charles R. Zandi*          *February 8, 2023*

17  _____          _____
    Charles R. Zandi                Date
18  Official Court Reporter

19

20

21

22

23

24

25